UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| RAPID-AMERICAN CORPORATION, | : | Case No. 13-10687 (SMB) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------X

| | | |
|---|---|---|
| RAPID-AMERICAN CORPORATION, THE | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS, AND LAWRENCE | : | |
| FITZPATRICK, THE FUTURE CLAIMANTS' | : | |
| REPRESENTATIVE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -against- | : | Adv. Proc. No. 15-01095 (SMB) |
| | : | |
| TRAVELERS CASUALTY AND SURETY | : | |
| COMPANY, ST. PAUL FIRE AND MARINE | : | |
| INSURANCE COMPANY, AND NATIONAL | : | |
| UNION FIRE INSURANCE COMPANY OF | : | |
| PITTSBURGH, PA, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------X

### MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S :**

REED SMITH LLP
*Attorneys for the Debtor and Debtor-in-
   Possession*
599 Lexington Avenue, 22nd Floor
New York NY 10022

      Paul E. Breene, Esq.
      Paul M. Singer, Esq.
      Of Counsel

GILBERT LLP
*Insurance Counsel to the Official Committee*
  *Of Unsecured Creditors and the Future*
  *Claimants' Representative*
1100 New York Avenue, NW Suite 700
Washington, DC 20005

      Kami E. Quinn, Esq.
          Of Counsel

MENDES & MOUNT, LLP
*Attorneys for the Defendant National*
  *Union Fire Insurance Company of*
  *Pittsburgh, PA*
750 Seventh Avenue
New York, NY 10019

      Eileen T. McCabe, Esq.
      R. James Bradford, Esq.
          Of Counsel

CLYDE & CO US LLP
*Attorneys for Travelers Casualty and*
  *Surety Company and St. Paul Fire*
  *and Marine Insurance Company*
405 Lexington Avenue
New York, New York 10174

      Daren S. McNally, Esq.
      Barbara M. Almeida, Esq.
      John M. Vieira, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Plaintiffs Rapid-American Corporation ("Rapid"), the Official Committee of Unsecured

Creditors, and the Future Claimants' Representative (collectively, the "Plaintiffs") commenced

this adversary proceeding seeking a declaration of coverage and damages in connection with

certain excess insurance policies (the "Insurance Policies") sold by Defendants St. Paul Fire and

Marine Insurance Company and Travelers Casualty and Surety Company, f/k/a The Aetna

Casualty and Surety Company (collectively, "Travelers") and National Union Fire Insurance

Company of Pittsburgh, Pa. ("National Union," and collectively with Travelers, the "Insurers").

     The parties have moved or cross-moved for partial summary judgment.  The motions

relate to four excess policies and raise a common issue:  must the underlying insurance limits be

exhausted by actual payment before the Insurers' excess liability coverage attaches?  The

Plaintiffs contend that payment is unnecessary; it is sufficient that the accrued (but unpaid)

liabilities reach the level of the excess insurer's coverage.  With one exception, the Insurers

argue that their policies require actual payment of the underlying limits before liability attaches.

Travelers agrees, however, that Aetna policy number XN3635WCA, covering the period January

4, 1983 to January 4, 1984, does not require exhaustion, (*Memorandum of Law in Opposition to

Plaintiffs' Motion and in Support of Travelers' Cross-Motion*, dated Mar. 10, 2016 ("*Travelers

Memo*"), at 1 n.1 (ECF Doc. # 59-1)), and the Plaintiffs are entitled to partial summary judgment

with respect to that policy to that extent, but this does not resolve the claim that Aetna has

breached its contract.  The three other policies issued by the Insurers unambiguously require

actual payment before liability attaches.  Accordingly, the Plaintiffs' motion regarding the St.

Paul policy (defined below) and cross-motion regarding the two National Union policies (defined

below) are denied, and the Insurers' motions and cross-motions are granted.[1]

## BACKGROUND

     The material facts are not disputed.  Rapid is the successor to the liabilities of The Philip

Carey Manufacturing Company, a company that manufactured and distributed products

---

[1]      This decision will not consider the Aetna policy any further, and the balance of the discussion pertains to
the three remaining policies.

containing asbestos.  In 1974, claimants began suing Rapid in asbestos-related personal injury

actions.  Rapid settled many of the claims, but by the time it commenced this chapter 11 case on

March 8, 2013, there were approximately 275,000 asbestos-related personal injury claims

pending against it.

Rapid owned numerous primary and excess liability insurance policies during the

relevant periods.  Beginning in 1998, Rapid reached settlements with nearly all of its insurers.  In

addition, a number of insurers that issued policies to Rapid became insolvent and unable to pay

the full limits of those policies.  Although the parties dispute the point, I assume for the purpose

of the motions that Rapid has *accrued* liabilities that reach the level of excess coverage provided

under each policy at issue on the motions.  It is undisputed, however, that neither Rapid nor

anyone else has actually *paid* through settlement, judgment or otherwise an amount sufficient to

reach the level of excess coverage provided under the policies at issue.

## A.    The St. Paul Policy

St. Paul issued policy number 590XA6136 to Rapid, covering the period from October

31, 1974, to October 31, 1977 (the "St. Paul Policy").[2]  The St. Paul Policy sits atop $3 million

of primary coverage and $60 million of excess coverage.  According to the information

submitted by the Plaintiffs, the following chart summarizes the insurance underlying the St. Paul

Policy:

---

[2]      The Plaintiffs and Travelers disagree as to whether the St. Paul Policy's $10 million limit is an annual limit
or applies in the aggregate for the entire three-year policy period, *i.e.*, whether the St. Paul Policy provides up to $10
million or $30 million in coverage.  The National Union 1977 Policy discussed in the text, *infra*, runs for a fourteen
month period and raises a similar question. This issue is the subject of separate partial summary judgment motions
and cross-motions. Those motions (the "Limits Motions") appear to be mooted by the disposition of the instant
motions, and their status will be the subject of further discussions with the parties.

4

| Policy | Alleged Annual Limit | Alleged Status |
|---|---|---|
| Primary: CNA | $3,000,000 | Settlement or coverage-in-place |
| 1st Excess: Lloyd's | $1,000,000 | Settlement or coverage-in-place |
| 2nd Excess: Lloyd's | $9,000,000 | Settlement or coverage-in-place |
| 3rd Excess: Lloyd's | $10,000,000 | Settlement or coverage-in-place |
| 4th Excess: CNA | $20,000,000 | Settlement or coverage-in-place |
| 5th Excess: Lumbermens | $10,000,000 | Settlement or coverage-in-place |
| 6th Excess: Midland | $10,000,000 | Insolvent |
| **7th Excess: St. Paul** | **$10,000,000** | **Subject of Litigation** |

(*Affirmation of Paul M. Singer in Support of Plaintiffs' Motion for Partial Summary Judgment*, dated January 22, 2016 ("*Singer Affirmation*"), Ex. B (ECF Doc. # 41).)

The St. Paul Policy "follows form," which means it incorporates the terms of the "immediate underlying policy," (*see Singer Affirmation* Ex. A, at p. 4 of 10), and the Plaintiffs and Travelers agree that the "immediate underlying policy" is policy number XL 145076, issued by Midland Insurance Company (the "Midland Policy"). (*Plaintiffs' Consolidated Response to Travelers' Counterstatement and National Union's Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1 Regarding Actual Payment*, dated March 30, 2016, at 4 (ECF Doc. # 80).) The Midland Policy requires actual payment of the underlying limits before liability attaches:

> The Company's obligation to pay any ultimate net loss with respect to any accident or occurrence falling within the terms of this Policy shall not attach until the amount of the applicable underlying limit *has been paid by or on behalf of the Insured* on account of such accident or occurrence.

(*Singer Affirmation*, Ex. C, at p. 3 of 5 (emphasis added) (ECF Doc. # 41-3).)

5

The St. Paul Policy includes two other, common clauses which, the Plaintiffs argue, are relevant to the motions.  The first, a Maintenance of Underlying Insurance clause ("Maintenance Clause"), provides as follows:

> It is a condition of this Policy that the policy or policies referred to in Item 4 of the Declarations, including renewal or replacements thereof, shall be maintained, without alteration of terms or conditions, in full effect during the currency of this Policy except for any reduction or exhaustion of the aggregate limit contained therein solely by reason of losses that arise out of occurrences which take place during the period of this Policy.  *Failure of the insured to comply with the foregoing shall not invalidate this Policy but in the event of such failure the Company shall be liable hereunder only to the extent that it would have been liable had the insured complied therewith.*

(*Singer Affirmation*, Ex. A, at p. 6 of 10 (emphasis added.)  Second, the St. Paul Policy includes a provision, required by New York law, s*ee* N.Y. INS. LAW § 3420(a)(1), that "[b]ankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder."  (*Singer Affirmation*, Ex. A, at p. 6 of 10.)  This provision will be referred to as the Bankruptcy Clause.

**B.    The National Union 1977 Policy**

National Union issued policy number 122-93-43, in effect from October 31, 1977 to January 1, 1979 (the "National Union 1977 Policy").  According to the information submitted by the Plaintiffs, the following chart summarizes the primary and two levels of excess insurance coverage underlying the National Union 1977 Policy:

| Policy | Alleged Annual Limit | Alleged Status |
|---|---|---|
| Primary: CNA | Undisclosed | Settlement or coverage-in-place |
| 1st Excess: Northbrook | $20,000,000 | Settlement or coverage-in-place |
| 2nd Excess: CNA | $9,000,000 | Settlement or coverage-in-place |
| **3rd Excess:[3] National Union** | **$7,000,000** | **Subject of Litigation** |

---

[3]    The National Union 1977 Policy was allegedly part of a $40 million shared layer of coverage.  (*See Second Amended Complaint*, dated July 24, 2015 ("*Complaint*"), ¶ 24 (ECF Doc. # 26).)

| 3rd Excess: Fireman's Fund | $16,000,000 | Settlement or coverage-in-place |
|---|---|---|
| 3rd Excess: Hartford | $5,000,000 | Settlement or coverage-in-place |
| 3rd Excess: Mission Ins. Co. | $7,000,000 | Insolvent |
| 3rd Excess: City Ins. Co. | $5,000,000 | Insolvent |

(*Singer Affirmation*, Ex. B.)

The National Union 1977 Policy also "follows form" and states that "subject to all the

terms and conditions set forth below . . . the insurance afforded by this policy shall follow all the

terms and conditions of Policy Number to be Advised issued by Northbrook Insurance

Company." (*Affirmation of R. James Bradford in Support of National Union's Cross-Motion for*

*Summary Judgment that the Coverage Obligations of National Union's Excess Policies Do Not*

*Attach Until All Underlying Coverage Is Exhausted by Actual Payment of Claims or Losses*,

dated March 10, 2016 ("*Bradford Affirmation*"), Ex. A, at p. 2 of 3 (ECF Doc. # 60).)  Although

it does not identify the underlying form that it follows, the parties agree that the National Union

1977 Policy follows form to policy number 63-002-477 issued by Northbrook Insurance

Company (the "Northbrook 1977 Policy").  They disagree, however, whether another policy

issued by Northbrook, policy number 6-300-3826 (the "Northbrook 1978 Policy," and

collectively with the Northbrook 1977 Policy, the "Northbrook Policies"), is also incorporated by

the National Union 1977 Policy.  (*Compare Complaint* at ¶ 24 *with Memorandum of Law in*

*Support of National Union's Cross-Motion for Summary Judgment that the Coverage*

*Obligations of National Union's Excess Policies Do Not Attach Until All Underlying Coverage*

*Is Exhausted By Actual Payment of Claims or Losses*, dated Mar. 10, 2016 ("*Nat'l Union*

*Memo*"), at 3 n.7 (ECF Doc. # 62).)

The dispute is immaterial because each Northbrook Policy contains the following

Endorsement No. 2 that includes an express payment requirement:

7

In consideration of the premium charged, it is agreed that insofar as the "Liabilities" listed below are covered by valid and collectable underlying insurance as set out in the schedule of underlying policies and then only for such "Liabilities" as listed below for which coverage is afforded for said underlying insurances this policy subject to its limit of liability shall apply as excess.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying limits *by reason of losses paid thereunder*, this policy subject to all of its terms and conditions, shall

> 1. In the event of reduction pay the excess of the reduced underlying limit or,
>
> 2. In the event of exhaustion continue in force as underlying insurance.

(*Bradford Affirmation*, Ex. C, at p. 11 of 21 (emphasis added); *Bradford Affirmation*, Ex. D, at p. 20 of 31 (emphasis added).)[4]

Like the St. Paul Policy, the Northbrook 1978 Policy (but not the Northbrook 1977 Policy) contains a typical Maintenance Clause:

> It is a condition of this policy that that the policy or policies referred to in the attached Schedule of Underlying Policies shall be maintained in full effect during the policy period without the reduction of coverage or limits except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of accidents and/or Occurrences occurring during the period of this policy. Failure of the Named Insured to comply with the foregoing shall not invalidate this policy but in the event of such failures the Company shall only be liable to the same extent it would have been had the Named Insured complied with the said condition.

(*Bradford Affirmation*, Ex. D, at p. 10 of 31.)  In addition, the parties agree that the Northbrook 1978 Policy contains a Bankruptcy Clause similar to the St. Paul Policy.[5]  Although the Northbrook 1977 Policy does not contain a Bankruptcy Clause, a Bankruptcy Clause is

---

[4]    The Northbrook 1978 Policy provides that "[l]iability under this policy with respect to any Occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, *shall have paid the amount of the underlying limits* on account of such Occurrence."  (*Bradford Affirmation*, Ex. D, at p. 9 of 31 (emphasis added).)

[5]    The Northbrook 1978 Policy states that "[i]n the event of the bankruptcy or insolvency of the Insured or any entity comprising the Insured, the Company shall not be relieved thereby of the payment of any claims hereunder because of such bankruptcy or insolvency."  (*Bradford Affirmation*, Ex. D, at p. 9 of 31.)

nonetheless incorporated into each of the policies by operation of New York law.  *See* N.Y. INS. LAW § 3420 (requiring a Bankruptcy Clause in insurance contracts); N.Y. INS. LAW § 3103(a) (stating that any insurance contract that does not conform with New York's requirements "shall be enforceable as if it conformed with such requirements").

**C.       The National Union 1984 Policy**

National Union issued policy number 9608477, in effect from January 1, 1984 to January 1, 1985 (the "National Union 1984 Policy").  According to the information submitted by the Plaintiffs, the following chart summarizes the primary and three levels of excess insurance underlying the National Union 1984 Policy:

| Policy | Alleged Annual Limit | Alleged Status |
|---|---|---|
| Primary: National Union | $3,000,000 | Settlement or coverage-in-place |
| 1st Excess: New England Ins. Co. | $10,000,000 | Settlement or coverage-in-place |
| 2nd Excess: New England Re-Ins. | $25,000,000 | Settlement or coverage-in-place |
| 3rd Excess: Atlanta International | $24,000,000 (shared) | Settlement or coverage-in-place |
| 3rd Excess: New England Ins. Co. | $24,000,000 (shared) | Settlement or coverage-in-place |
| **4th Excess:[6] National Union** | **$10,000,000** | **Subject of Litigation** |
| 4th Excess: Fireman's Fund | $25,000,000 | Settlement or coverage-in-place |
| 4th Excess: Integrity | $6,000,000 | Insolvent |

(*Singer Affirmation*, Ex. B.)

The National Union 1984 Policy's Endorsement #2 expressly follows form to the underlying policy number NA000001 issued by the New England Insurance Company (the "New England Policy").  (*See Bradford Affirmation*, Ex. B, at p. 4 of 4.)  The New England Policy states that the obligation to pay rather than actual payment triggers coverage.  It agrees to

---

[6]       The National Union 1984 Policy was allegedly part of a $41 million shared layer of coverage.  (*See Complaint* ¶ 25.)

indemnify "the Insured for Ultimate Net Loss, as defined hereinafter, in excess of the Retained

Limit, as herein stated, all sums which the Insured *shall be obligated* to pay by reason of the

liability imposed upon or liability assumed by the Insured under contract or agreement for

damages and expenses." (*Bradford Affirmation*, Ex. E, at p. 3 of 25 (emphasis added).)

Additionally, its Payment of Ultimate Net Loss provision states that "[c]overage . . . shall not

apply unless and until the Insured, or the Insured's underlying insurer, *shall be obligated to pay*

the amount of the Underlying Limit or the Retained Limit . . . . When the amount of the Ultimate

Net Loss has finally been determined, the Company shall promptly indemnify." (*Bradford*

*Affirmation*, Ex. E, at p. 6 of 25 (emphasis added).)

    However, the New England Policy also includes language stating that certain of the

insurer's obligations are triggered by the exhaustion by payment of applicable underlying

insurance:

> If underlying insurance applicable in any one OCCURRENCE *is exhausted by*
> *payment of judgment or settlement on behalf of the INSURED*, the COMPANY
> shall be obligated to assume charge of the settlement or defense of any claim or
> proceeding against the insured resulting from the same occurrence, but only
> where this policy applies immediately excess of such underlying insurance,
> without the intervention of excess insurance of another insurer.

(*Bradford Affirmation*, Ex. E, at p. 6 of 25 (emphasis added).)

    Although the language in the National Union 1984 Policy and the New England Policy

do not unambiguously require exhaustion of underlying policies as a condition precedent to

attachment of National Union's duty to indemnify, the Plaintiffs agreed at oral argument that

both National Union Policies require exhaustion of underlying insurance similar to the St. Paul

Policy. (*Transcript of April 11, 2016 Hr'g* at 32:9-21, 33:17-34:3 (ECF Doc. # 93).)

The New England Policy also contains a Maintenance Clause similar to the others

described above:

> It is warranted by the Insured that the underlying policy(ies) listed in Schedule A,
> or renewals or replacements thereof not more restrictive in coverage, shall be
> maintained in force during the currency of this policy, except for any reduction in
> the aggregate limit(s) contained therein solely by payment of claims in respect of
> OCCURRENCES happening during the period of this policy.  In the event of
> failure by the INSURED so to maintain such policy(ies) in force, the insurance
> afforded by this policy shall apply in the same manner it would have applied had
> such policy(ies) been so maintained in force.

(*Bradford Affirmation*, Ex. E, at p. 6 of 25.)

Finally, the New England Policy also includes a Bankruptcy Clause, stating that "[i]n the

event of the bankruptcy or insolvency of the INSURED or any entity comprising the INSURED,

the COMPANY shall not be relieved thereby of the payment of any claims hereunder because of

such bankruptcy or insolvency."  (*Bradford Affirmation*, Ex. E, at p. 6 of 25.)

## D.     This Adversary Proceeding

The Plaintiffs filed this adversary proceeding on March 31, 2015, and filed the *Complaint*

on July 24, 2015.  They allege that Rapid has spent, made, or committed to make at least

$701,782,193.49 in indemnity payments and defense costs relating to asbestos claims.

(*Complaint* ¶ 29.)  Furthermore, approximately 275,000 asbestos claims against Rapid remain

pending, and numerous others are likely to be filed in the future.  (*Complaint* ¶¶ 4, 35.)  The

Plaintiffs argue that the Insurance Policies provide total limits of $64 million, (*Complaint* ¶ 7),

but the Insurers have denied that they are liable under the Insurance Policies.  (*Complaint* ¶¶ 31-

34.)

The *Complaint* includes two causes of action.  The first seeks a declaratory judgment that

the underlying limits of the Insurance Policies have been exhausted and that coverage under the

11

Insurance Policies has attached or will attach upon the lifting of the automatic stay.  (*Complaint* ¶ 55.)  The second alleges that the Insurers breached their respective insurance contracts and seeks compensatory and consequential damages.  (*Complaint* ¶¶ 51-53, 56.)

The Insurers' answers deny liability.  (*Defendant National Union Fire Insurance Company of Pittsburgh, PA's Answer to Plaintiffs' Second Amended Complaint*, dated Aug. 24, 2015 ("*National Union Answer*"), ¶¶ 35-42 (ECF Doc. # 28); *Answer to Second Amended Complaint*, dated Aug. 24, 2015 ("*Travelers Answer*"), ¶¶ 35-42 (ECF Doc. # 30).)  In addition, they allege, as one of many affirmative defenses, that coverage under the Insurance Policies is barred because the Plaintiffs have not exhausted other applicable insurance underlying the Insurance Policies.  (*National Union Answer* at 14; *Travelers Answer* at 10.)

The Plaintiffs filed their motion for partial summary judgment solely against Travelers on January 22, 2016.[7]  Travelers opposed the motion, and on March 10, 2016, Travelers and National Union each separately cross-moved for summary judgment.[8]  The Plaintiffs filed a consolidated response to the cross-motions on March 30, 2016 and apparently cross-moved

---

[7]     *Notice of Motion for Partial Summary Judgment*, dated January 22, 2016 (ECF Doc. # 45).

[8]     *Notice of National Union's Cross-Motion for Summary Judgment that the Coverage Obligations of National Union's Excess Policies Do Not Attach Until All Underlying Coverage Is Exhausted by Actual Payment of Claims or Losses*, dated March 22, 2016 (ECF Doc. # 58); *Notice of Cross-Motion for Summary Judgment that the St. Paul Policy Is Not Attached Until the Underlying Limits are Paid by or on Behalf of Rapid-American Corporation*, dated March 22, 2016 (ECF Doc. # 59).

against National Union with respect to the National Union Policies.[9]  Travelers and National

Union each filed a reply in support of their respective cross-motions on April 13, 2016.[10]

The Plaintiffs' arguments boil down to three points.  First, *Zeig v. Mass. Bonding & Ins.

Co.*, 23 F.2d 665 (2d Cir. 1928) mandates that the exhaustion language not be read literally, and

is satisfied if the insured settles with and releases the underlying insurer, even though that insurer

did not pay the full policy limits in cash.  (*Plaintiffs' Motion for and Memorandum in Support of*

*Summary Judgment that Travelers' Excess Policies are Triggered at Such Time as Rapid Has*

*Incurred Sufficient Liability to Exhaust the Underlying Coverage*, dated Jan. 22, 2016

("*Plaintiffs Memo*"), at 9-13 (ECF Doc. # 47).)  Second, the Bankruptcy Clause and New York

Insurance Law preclude the Insurers from relying on the exhaustion language because

bankruptcy has rendered Rapid unable to fill any gap by paying up to the underlying limits, a

condition to the Insurers' coverage liability.  (*Plaintiffs Memo* at 6-7; *Plaintiffs' Consolidated*

*Response to Insurers' Motion for Summary Judgment*, dated March 30, 2016 ("*Plaintiffs*

*Response*"), at 6 (ECF Doc. # 79).)  In support, they cite several decisions that relieved debtors

---

[9]      The Plaintiffs' submissions directed at National Union did not include a document denominated a "cross-motion."  However, their *Notice of Plaintiffs' Consolidated Response to Insurers' Motion for Summary Judgment*, dated March 30, 2016 (ECF Doc. # 78) states that they are seeking an order "granting Plaintiffs' Cross-Motion for Partial Summary Judgment," *id.* at 2, and their consolidated response concludes by requesting "partial summary judgment in its [*sic*] favor, and against both Travelers and National Union."  *Plaintiffs' Consolidated Response to Insurers' Motion for Summary Judgment*, dated March 30, 2016, at 13-14 (ECF Doc. # 79).  The Court will treat these submissions as a cross-motion directed at National Union.

[10]      *Reply Memorandum of Law in Further Support of Travelers Cross-Motion for Summary Judgment that the St. Paul Policy Is Not Attached Until the Underlying Limits Have Been Paid by or on Behalf of Rapid-American Corporation*, dated April 13, 2016 ("*Travelers Reply*") (ECF Doc. # 84); *National Union's Reply Memorandum of Law in Further Support of Its Cross-Motion for Summary Judgment that the Coverage Obligations of National Union's Excess Policies Do Not Attach Until All Underlying Coverage Is Exhausted by Actual Payment of Claims or Losses and in Opposition to Plaintiffs' Motion for Partial Summary Judgment*, dated April 13, 2016 ("*Nat'l Union Reply*") (ECF Doc. # 88).

of their duties to satisfy self-insured retentions.[11]  (*Plaintiffs Response* at 6-9.)  The Plaintiffs

also argue that, even absent a Bankruptcy Clause, "Bankruptcy Code § 365 imposes obligations

on insurers to pay claims under the policies despite the bankrupt party's failure to comply with

contractual obligations."  (*Plaintiffs Response* at 11.)  Third, the Plaintiffs contend that the

Maintenance Clauses in the St. Paul Policy, the Northbrook 1978 Policy, and the New England

Policy preclude the Insurers from requiring exhaustion of underlying insurance.  (*Plaintiffs

Response* at 4-5.)

    Travelers and National Union argue that *Zeig* does not govern the interpretation of the

exhaustion requirement in light of the Second Circuit's decision in *Ali v. Fed. Ins. Co.*, 719 F.3d

83 (2d Cir. 2013) and the First Department's decision in *Forest Labs., Inc. v. Arch Ins. Co.*, 984

N.Y.S.2d 361 (1st Dep't 2014).  (*Travelers Memo* at 11; *Nat'l Union Memo* at 8-11.)

Furthermore, the Bankruptcy Clause and the New York Insurance Law do not permit the

Plaintiffs to ignore the policies' unambiguous exhaustion requirement.  (*Travelers Memo* at 16;

*Nat'l Union Reply* at 2.)  Travelers and National Union are not relying on Rapid's bankruptcy or

insolvency to deny coverage; rather, the policies expressly require exhaustion of underlying

insurance, and Rapid's bankruptcy does not negate those provisions.  (*Id.*)  Finally, the Insurers

assert that Maintenance Clauses are intended to require the insured to maintain underlying

insurance and to prevent insurers from having to "drop down" to cover gaps in coverage.

(*Travelers Memo* at 12-13; *Nat'l Union Memo* at 14-15.)[12]

---

[11]     A self-insured retention ("SIR") is "an amount that an insured retains and covers before insurance coverage
begins to apply.  Once a SIR is satisfied, the insurer is then liable for amounts exceeding the retention, less any
agreed deductible."  *In re Sept. 11th Liab. Ins. Coverage Cases*, 333 F. Supp. 2d 111, 124 n.7 (S.D.N.Y. 2004).

[12]     Travelers also challenges the Plaintiffs intended use of statistical sampling and extrapolation to prove that
Rapid's accrued liability exceeds the underlying policy limits.  (*Travelers Memo* at 19.)  The Plaintiffs did not seek

## DISCUSSION[13]

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by Fed. R. Bankr. P. 7056, governs summary judgment motions.  Summary judgment

is appropriate "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court's function

is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to

be tried.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party bears the

initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.

*Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  If the movant carries this

initial burden, the nonmoving party must set forth specific facts that show triable issues, and

cannot rely on pleadings containing mere allegations or denials.  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

324 (1986).  In deciding whether material factual issues exist, all ambiguities must be resolved

and all reasonable inferences must be drawn in favor of the nonmoving party.  *Matsushita Elec.*,

475 U.S. at 587.

---

summary judgment on this issue, and the use of statistical sampling is fraught with factual and legal issues that go
well beyond the scope of the parties' submissions.  Accordingly, it is not appropriate for summary judgment.

[13]     The adversary proceeding is non-core, and less than all of the parties have consented to this Court's
authority to enter a final judgment.  Accordingly, the Court's authority is limited to submitting proposed findings of
fact and conclusions of law.  *See* 28 U.S.C. § 157(c)(1).  Despite this conclusion, it is premature to follow the
procedure set out in Federal Bankruptcy Rule 9033.  Neither the statute nor Rule 9033 states when the proposed
findings and conclusions must be submitted.  The claims against Aetna are unresolved, and hence, this order is
interlocutory.  Given the policy against piecemeal appeals generally, the Court will submit its proposed findings and
conclusions at the conclusion of the adversary proceeding.  *See O'Toole v. McTaggart* (*In re Trinsum Grp., Inc.*),
467 B.R. 734, 742 (Bankr. S.D.N.Y. 2012).

The motion and cross-motions concern the interpretation of insurance policies, and "[a]s

in other contract disputes, insurance policies are interpreted according to their plain terms."[14]

*Ali*, 719 F.3d at 90; *accord Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 98 (2d Cir. 2012);

*Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999).

The initial question on summary judgment is "whether the contract is unambiguous with respect

to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube

Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union

Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  In interpreting a contract and considering whether

ambiguities exist, words should not be read in isolation; a contract's terms should be examined in

the context of the whole agreement.  *Horowitz v. Am. Int'l Grp.*, Inc., 498 F. App'x 51, 53 (2d

Cir. 2012); *In re Young Broad. Inc.*, 430 B.R. 99, 116 (Bankr. S.D.N.Y. 2010).  Furthermore,

courts must "seek to give "[e]ffect and meaning . . . to every term of [a] contract."  *XL Specialty

Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 284 (S.D.N.Y. 2012) (quoting *Reda v.

Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996)).

---

[14]      The parties' have not addressed the governing law under the Insurance Policies.  The Plaintiffs and
Travelers assert that New York law should resolve this dispute, (*see Plaintiffs Memo* at 9 ("Controlling New York
Law Under *Zeig* Compels This Result"); *Travelers Reply* at 3 ("Travelers simply asks this Court to apply current
New York law . . . .")), and the Insurers rely almost exclusively on New York law and cases applying New York law
in interpreting and applying the relevant contractual provisions.  (*See, e.g.*, *Travelers Memo* at 5-6 ("Under New
York insurance law . . . ."); *Nat'l Union Memo* at 6 ("[S]tate and federal decisions in New York have distinguished
and limited the holding in *Zeig*.").)  Although National Union has "reserve[d] the right [to] argue the appropriate
state's law to be applied," (*Nat'l Union Memo* at 5 n.8), it has neither provided any basis for application of any other
jurisdiction's laws nor described how any other jurisdiction's substantive law differs from New York's.
Accordingly, the parties have impliedly, if they have not expressly, consented to the Court's application of New
York law.  *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law
controls, and such implied consent . . . is sufficient to establish choice of law.") (quoting *Krumme v. WestPoint
Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)); *see Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d
137, 143 (2d Cir. 2004) ("In the absence of substantive difference [in the laws of competing jurisdictions], however,
a New York court will dispense with choice of law analysis").

Language in the St. Paul Policy explicitly requires the payment of underlying insurance limits before coverage liability attaches.  The Midland Policy, which it incorporates, states that the insurer's "obligation to pay any ultimate net loss . . . shall not attach until the amount of the applicable underlying limit has been paid by or on behalf of the Insured."  (*Singer Affirmation*, Ex. C, at p. 3 of 5.)  Similarly, the National Union 1977 Policy incorporates Endorsement No. 2 under which coverage attaches "[i]n the event of reduction or exhaustion of the aggregate limits of liability under said underlying limits by reason of losses paid thereunder."  Moreover, the Plaintiffs conceded at oral argument that the National Union Policies require exhaustion to the same extent as the St. Paul Policy.

Despite the unambiguous exhaustion language, and/or the concession in the case with respect to the National Union Policies, the Plaintiffs contend, citing *Zeig*, that they are entitled to partial summary judgment on the exhaustion question.  In *Zeig*, the defendant insurer had issued a $5,000 excess burglary insurance policy which provided that it would apply "only after all other insurance herein referred to shall have been exhausted in the payment of claims to the full amount of the expressed limits of such other insurance."  The other, underlying policies had policy limits totaling $15,000.  Following a burglary, the plaintiff insured settled his claims against the underlying policies for only $6,000, and sought coverage from the defendant.  The defendant denied coverage arguing that the plaintiff had not "exhausted" the $15,000 of underlying insurance as a result of his settlements below the policy limits.

The Second Circuit disagreed, rejecting the defendant's "stringent" interpretation of its policy, although it recognized that the parties could impose such a requirement if they chose to do so.  The Court observed that "the defendant had no rational interest in whether the insured collected the full amount of the primary policies, so long as it was only called upon to pay such

17

portion of the loss as was in excess of the limits of those policies," *id.* at 666, and the defendant's

reading would promote delay and prevent settlements. *Id.* "A result harmful to the insured, and

of no rational advantage to the insurer, ought only to be reached when the terms of the contract

demand it." *Id.* Turning to the language in the policy, the Court observed that it did not require

"collection" of the full amount of the primary insurance. *Id.* In addition, "payment" was not

limited to a cash satisfaction and could be interpreted to include satisfaction of a claim by

compromise or in other ways. *Id.* "To render the policy in suit applicable, claims had to be and

were satisfied and paid to the full limit of the primary policies." *Id.*

*Zeig*'s continuing vitality is open to question following the Second Circuit's decision in

*Ali v. Fed. Ins. Co.*, 719 F.3d 83 (2d Cir. 2013).[15] In *Ali*, the plaintiff insurers sought declaratory

relief that their excess directors' and officers' liability insurance policies did not attach until

actual payment of the full amount of the underlying insurance; the defendant directors argued, as

the Plaintiffs do here, that coverage attached once their obligations exceeded the underlying

insurance even if it remained unpaid. One of the at-issue insurance policies stated that coverage

would "attach only after all . . . 'Underlying Insurance' has been exhausted by payment of

claim(s)" and the other indicated that excess liability coverage "shall attach only after all such

Underlying Insurance has been exhausted," and that exhaustion occurs "solely as a result of

payment of losses thereunder." *Id.* at 91. The District Court granted the insurers' motion for

---

[15]       The Plaintiffs cite several decisions that referred to *Zeig* as good law.  *See Lasorte v. Those Certain Underwriters at Lloyd's*, 995 F. Supp. 2d 1134, 1143 (D. Mont. 2014) ("The court's reasoning in *Zeig* remains good law in New York."); *Lexington Ins. Co. v. Tokio Marine & Nichido Fire Ins. Co.*, No. 11 CIV. 391 DAB, 2012 WL 1278005, at *3 (S.D.N.Y. Mar. 28, 2012) ("*Zeig* continues to be the seminal decision interpreting New York insurance law in this Circuit."); *Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 04 CIV. 1134 (LTS), 2006 WL 1982789, at *7 (S.D.N.Y. July 12, 2006) (citing *Zeig*).  Only *Lasorte* was decided after *Ali*, but it did not mention the decision.  Moreover, *Zeig* reached its decision through the interpretation and application of federal common law that ceased to exist after *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  *See Ali*, 719 F.3d at 92 n.16.

judgment on the pleadings, *Fed. Ins. Co. v. Gould*, No. 10 Civ. 1160(RJS), 2011 WL 4552381 (S.D.N.Y. Sept. 28, 2011), and the directors appealed.

The Court of Appeals affirmed.  It initially explained that excess insurance coverage does not attach until the underlying insurance has been exhausted, and "'the very nature of excess insurance coverage is such that a predetermined amount of underlying primary coverage must be paid before the excess coverage is activated.'"  *Ali*, 719 F.3d at 91 (quoting *Gabarick v. Laurin Mar. (Am.), Inc.,* 649 F.3d 417, 422 (5th Cir. 2011) (alteration and quotation marks omitted)). Because liability does not attach until the underlying insurance is exhausted, excess insurance is available at a lower cost.  *Id.*

Turning to the language of the relevant policies, the Court rejected the directors' argument that coverage was triggered when the "obligations" reached the attachment point.  The policies required "payment."  The directors' interpretation ignored that "obligations" and "payment" were not similar, and their interpretation rendered the "payment of" language in the policies superfluous.  *Id.* at 91.  Further, although the policy language in *Ali* and *Zeig* were similar, the Second Circuit found *Zeig* unpersuasive.  *Id.* at 92.  *Zeig* concerned first party property insurance.  Zeig had suffered out-of-pocket losses in excess of $15,000, and settling his primary claims for less damaged Zeig, not his insurer.  *Id.* at 93.  The *Zeig* Court rejected a "natural reading" of the policy because it would lead to a result harmful to the insured and of no rational advantage to the insurer, and concluded that Zeig could exhaust his primary coverage through actual cash payments or through a settlement agreement.  *Id.*

In contrast, *Ali* dealt with a third-party liability policy, and "nothing is inherently errant or unusual about interpreting an exhaustion clause in an excess *liability* insurance policy

19

differently than a similarly written clause in a first-party *property* insurance policy." *Id.* (emphasis in original). In cases like *Zeig* involving first-party property insurance, the insured suffers a fixed out-of-pocket loss for which he seeks indemnification. In cases like *Ali*, the requested relief focuses on the insured's obligations to pay third parties, and this difference is relevant when interpreting a liability insurance policy. The excess plaintiffs bargained for actual payment before their coverage liability attached, and if insureds could trigger the excess policies based on their aggregated, unpaid losses, they might be tempted to structure inflated settlements that would have the same effect of requiring the excess insurers to "drop down" and assume coverage in place of insolvent carriers. *Id.* at 94.

While *Ali* was wending its way through the federal court system, the same issue was presented to the New York state courts in *Forest Labs., Inc. v. Arch Ins. Co.*, 953 N.Y.S.2d 460 (N.Y. Sup. Ct. 2012), *aff'd,* 984 N.Y.S.2d 361 (N.Y. App. Div. 2014). There, the plaintiff maintained primary directors' and officers' insurance and several levels of excess coverage. The last excess insurer's policy included exhaustion language stating "[i]t is agreed that the **Insurer** shall not pay any amount until all retentions and **Underlying Limits of Liability** *have actually been paid*." *Id.* at 463 (emphasis added).[16] The plaintiff settled with the underlying insurers for less than the policy limits, and sought coverage from the final excess insurer. Noting *Zeig*'s observation that the parties could require exhaustion by actual cash payment, *see Zeig*, 23 F.2d at 666, the trial court held that the exhaustion provision unambiguously required the underlying insurers to pay up to the policy limits before the last level of excess coverage attached. *Forest*

---

[16]    The excess policy at issue included "follow form" language but also contained its own exhaustion language that differed slightly from the incorporated exhaustion language. The Court concluded that the difference was immaterial, *Forest Labs.*, 953 N.Y.S.2d at 464, and I have quoted the exhaustion language from the at-issue policy.

*Labs.*, 953 N.Y.S.2d at 465-66.  The Appellate Division affirmed in a brief opinion.  984

N.Y.S.2d 361, 362 (N.Y App. Div. 2014) ("The motion court properly determined that the

express terms of RSUI's policy providing excess coverage to plaintiff required the previous layer

of excess coverage to be exhausted through actual payment of that policy's limit prior to RSUI

being required to pay.").

As in *Ali* and *Forest Laboratories,* the exhaustion language in the Insurance Policies

requires, and the Plaintiffs' concede that it requires, that Rapid must exhaust the underlying

primary and excess insurance through payment before coverage attaches.  *Zeig*'s reading of

similar language in a first-party property damage policy does not inform the Court's

interpretation of the exhaustion language in the subject excess insurance policies for the reasons

explained by the *Ali* Court.

At oral argument, the Plaintiffs attempted to draw distinctions with *Ali* in light of the

concerns expressed by the *Ali* Court.  The Second Circuit foresaw the possibility that insureds

might attempt to manipulate settlements to reach higher levels of excess coverage.  According to

the Plaintiffs, this same fear is not present in a bankruptcy case because the Court would

supervise any settlement between Rapid and asbestos claimants.  However, the Court's role in

reviewing a settlement is limited to determining whether the settlement "fall[s] below the lowest

point in the range of reasonableness."  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599,

608 (2d Cir. 1983), and focuses on the benefits to the estate and its creditors, not on the settling

non-debtor parties.  *Cf. In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006) ("The

Court must make an informed judgment whether the settlement is fair and equitable and in the

best interests *of the estate*." (emphasis added)).  In fact, any settlement implicating coverage by

an insolvent or near-insolvent excess insurer that is structured to trigger a higher level of solvent

excess insurance coverage would benefit the estate to the possible detriment of the latter insurer.

Additionally, the Plaintiffs asserted that *Ali* involved claims-made insurance policies,[17]

and an insured would know the entire universe of claims by the end of its policy period.

According to the Plaintiffs, insureds in the claims-made context have little incentive to preserve

the limits of that insurance, as there is no risk that future unknown claims will be identified and

require further coverage under those policies.  In the occurrence policy context (as in the instant

case), however, insureds have an incentive to preserve the limits of their insurance, as future

claims may become known which would require accessing the available coverage.  There is no

indication in *Ali*, however, that this distinction played any part in the Court's decision.  In

addition, an insured could still be tempted to manipulate the settlement where the underlying

insurer under an occurrence policy is insolvent in order to reach the next level of coverage.

The Plaintiffs also argue that the Maintenance and Bankruptcy Clauses conflict with the

exhaustion clause, or at a minimum, create an ambiguity.  A Maintenance Clause is designed to

protect an excess insurer by establishing that its coverage will not "drop down" in the event that

the insured fails to maintain a lower level policy or the lower level policy is invalidated.  *See JP*

*Morgan Chase & Co. v. Indian Harbor Ins. Co.*, 930 N.Y.S.2d 175, 2011 WL 2320087, at *8

(N.Y. Sup. Ct. May 26, 2011) ("*Indian Harbor I*") (interpreting Illinois law), *aff'd* 947 N.Y.S.2d

17 (N.Y. App. Div. 2012) ("*Indian Harbor II*"); *see Fed. Ins. Co. v. Gould*, 2011 WL 4552381,

---

[17]     A claims-made policy "provides coverage for claims made during the policy period regardless of when the events out of which the claim arose occurred."  7 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INS. § 102:22 (3d ed. 2015).  In contrast, occurrence-based policies "respond to . . . liabilities arising out of 'bodily injury' or 'property damage' that took place during the time that such policies were in effect, even if the claim is not made until years after the termination of the policy."  *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1192 (2d Cir. 1995).

at 5 (The "language [of the Maintenance Clause] expressly demonstrates that the coverage provided by the Excess Insurers will not be enlarged to compensate for gaps in underlying coverage.")  A settlement with an underlying insurer does not constitute a failure to maintain the underlying policy, and does not excuse the condition precedent imposed by an exhaustion requirement.  *Indian Harbor II*, 947 N.Y.S. 2d at 24 (interpreting Illinois law).[18]  More, the Insurers are seeking to enforce the Insurance Policies, not invalidate them, and the Maintenance Clause does not apply.  *Id.*

Finally, the Bankruptcy Clause does not eliminate the exhaustion requirement.  The Bankruptcy Clause is required by New York Insurance Law § 3420(a)(1) which provides in relevant part that

> No policy or contract insuring against liability for injury to person . . . shall be issued or delivered in this state, unless it contains in substance . . . [a] provision that the insolvency or bankruptcy of the person insured, or the insolvency of the insured's estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract.

---

[18]     The Plaintiffs also refer to *dicta* in *Ali* that it would be "odd" to "requir[e] nonoperational insurance companies to make payments as a condition precedent to the attachment" of higher-level policies.  (*Plaintiffs' Response* at 9) (quoting *Ali*, 719 F.3d at 92 n. 15).  The *dicta* focused on a different question – whether the lower level insurer had to make the payments necessary to trigger the next level of excess coverage, or instead, whether the underlying amounts had to be paid regardless of who paid them.  Here, the St. Paul Policy requires that the payment be made "by or on behalf of the insured."  The payment need not, therefore, be made by the insurer or Rapid as long as the underlying amounts are paid.  The National Union 1977 Policy is less clear; it states that coverage will attach "in the event of reduction or exhaustion of the aggregate limits of liability under said underlying limits by reason of losses paid thereunder."  Finally, the National Union 1984 Policy does not unambiguously require exhaustion but the Plaintiffs conceded at oral argument that the National Union Policies were subject to an exhaustion requirement similar to the St. Paul Policy.  Lastly, to the extent that the "who pays" provisions are ambiguous, the Court agrees that it would be "odd" to read them to require an insolvent insurer (or an insolvent debtor) to pay the necessary amounts, and effectively free the excess insurers from the obligation to provide coverage.  Accordingly, the only reasonable interpretation is that the exhaustion requirement can be satisfied through payment by the insured, the lower level insurers or a third party.

N.Y. INS. LAW § 3420.  Even if an insurance policy conflicts with or does not include the

provisions required by section 3420, the policy "shall be enforceable as if it conformed" with the

requirements of section 3420.[19]  N.Y. INS. LAW § 3103(a).

Section 3420 and its predecessors were designed to protect a third party injured by a

bankrupt or insolvent insured that never suffered a loss within the meaning of the insurance

policy because it could not pay or did not have to pay the injured party.  At common law,

"[a]lthough the insured had done injury to a third person within the scope of the policy, the third

person, lacking privity of contract with the insurer, was left to suffer his injuries without recourse

against the insurance company, which in a sense thereby realized a windfall."  *American Bank &*

*Trust Co. v. Davis (In re F. O. Baroff Co., Inc.),* 555 F.2d 38, 41 (2d Cir. 1977); *accord Lang v.*

*Hanover Ins. Co.*, 820 N.E.2d 855, 857 (N.Y. 2004) ("Under the common law, 'an injured

person possessed no cause of action against the insurer of the tort feasor.'" (quoting *Jackson v.*

*Citizens Cas. Co.,* 277 N.Y. 385, 389 (1938))).  Thus, at common law,

> "[I]f the insured was insolvent, so that the person injured or the estate of one
> killed was unable to satisfy the judgment against him, the insurer in effect would
> be released. The policy being one of indemnity against loss suffered by the
> principal, it followed that the insured having suffered no damage, there was no
> loss for the insurer to indemnify" (*Jackson v. Citizens Cas. Co.,* 277 N.Y. at 389,
> 14 N.E.2d 446).  Insurance companies thus were able to avoid paying judgments
> for losses that would have been covered under policies issued to their insureds.

*Lang*, 820 N.E.2d at 858.

In 1917, New York State enacted section 109 of the Insurance Law, the predecessor to

the current section 3420, to give a limited cause of action on behalf of injured parties against the

---

[19]    As a result, any rights and obligations created by section 3420(a)(1) are applicable to the National Union
1977 Policy, even though that policy does not appear to include that language.

bankrupt or insolvent tortfeasor's insurer, and preclude insurers from refusing to pay claims on

policies of insolvent or bankrupt insureds. *See Coleman v. New Amsterdam Cas. Co.*, 160 N.E.

367, 368-69 (N.Y. 1928). But the statute went no further and did not excuse compliance with

conditions precedent imposed on the insured under the policy. In *Coleman*, decided under

section 109, a bankrupt insured had failed to cooperate with his insurer as required under the

policy. The insurer maintained that the judgment creditor possessed no greater rights than the

insured, and the insured's breach of the policy's cooperation condition precluded the judgment

creditor from enforcing the policy. *Coleman*, 160 N.E. at 369. Chief Judge Cardozo agreed:

> The effect of the statute is to give to the injured claimant a cause of action against
> an insurer for the same relief that would be due to a solvent principal seeking
> indemnity and reimbursement after the judgment had been satisfied. The cause of
> action is no less but also it is no greater. Assured and claimant must abide by the
> conditions of the contract.

*Id.*; *accord Larkin v. Munson S.S. Line*, 100 F.2d 393, 394 (2d Cir. 1938) ("The purpose of the

statute was only to protect the injured person; the insured needed no protection, he could take out

what kind of insurance he chose, and except for the one condition of his insolvency, its terms

would be enforced; indeed even against the injured person."); *Lauritano v. Am. Fid. Fire Ins.*

*Co.*, 162 N.Y.S.2d 553, 565 (N.Y. App. Div. 1957) ("While the purpose of the statute is to give

an injured person an independent cause of action against an insurer, it is subject, nevertheless, to

compliance by the assured with the conditions contained in the policy."), *aff'd,* 152 N.E.2d 546

(N.Y. 1958).

The Plaintiffs correctly point out that § 3420(a) or similar provisions under the laws of

other states have been invoked to relieve a bankruptcy debtor of the duty to pay the amount of an

SIR before the insurer's liability attaches. *See Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R.

275, 282 (E.D.N.Y. 2009) ("[B]ecause the bankruptcy clause must be given full force and effect

25

. . . , the policy's SIR endorsement cannot be construed under any theory as precluding Grace

from coverage if it cannot fund the SIR as contractually required."); *Am. Safety Indem. Co. v.*

*Vanderveer Estates Holding, LLC (In re Vanderveer Estates Holding, LLC)*, 328 B.R. 18, 24-25

(Bankr. E.D.N.Y. 2005) (holding, pursuant to Illinois statute similar to New York's section

3420(a)(1), that "injured parties shall be compensated whether or not a bankrupt debtor pays its

self-insured retention"), *aff'd sub nom. Am. Safety Indem. Co. v. Official Comm. of Unsecured*

*Creditors*, No. 05-5877 ARR, 2006 WL 2850612 (E.D.N.Y. Oct. 3, 2006); *Rollo v. Servico New*

*York, Inc.*, 914 N.Y.S.2d 811, 813-14 (N.Y. App. Div. 2010) ("[D]efendants' insurer remains

obligated to pay damages for injuries or losses covered under the policy, despite the fact that

defendants' obligation to satisfy the SIR was discharged through the bankruptcy

proceedings. . . .").   The Plaintiffs argue that Rapid is in bankruptcy and an analogous rule

should apply to the exhaustion requirements in the Insurance Policies.

The argument ignores a significant distinction.  In the SIR cases, the bankrupt had to pay

the SIR before coverage liability attached.  *See, e.g.*, *Vanderveer*, 328 B.R. at 22 ("The Insurance

Policy contains a self-insured retention endorsement . . . that requires the Debtor to pay the first

$25,000 of defense costs, legal fees, and the costs of any settlement or judgment . . . ."); *Grace*,

409 B.R. at 277 ("[A] $50,000 self-insured retention (SIR) provision . . . made the first $50,000

of any loss the responsibility of the insured . . . .").  Bankruptcy prevented the insured from

satisfying its pre-petition SIR obligation.  In contrast, the operative exhaustion language in the

Insurance Policies only requires that the amounts be paid by or on behalf of Rapid.  Thus, the

Insurance Policies still permit some party other than Rapid to satisfy the exhaustion requirements

and trigger coverage.

Finally, the Plaintiffs assert, with little analysis, that "Bankruptcy Code § 365 imposes obligations on insurers to pay claims under the policies despite the bankrupt party's failure to comply with contractual obligations." (*Plaintiffs' Response* at 11.) Section 365 details the rights and obligations relating to treatment of a debtor's executory contracts and unexpired leases in bankruptcy. *See Sigmon v. Goldman Sachs Mortgage Co.*, No. 1:12-CV-3367 ALC, 2015 WL 5724736, at *4 (S.D.N.Y. Sept. 29, 2015) (noting that "Section 365 applies only to executory contracts"); *Geron v. Valeray Realty Co. (In re Hudson Transfer Grp.), Inc.*, 245 B.R. 456, 458 (Bankr. S.D.N.Y. 2000) ("Section 365 governs the assumption and rejection of executory contracts and unexpired leases."). The Insurance Policies are not executory contracts. *Vanderveer*, 328 B.R. at 25 ("[W]here (as in this case) an insured debtor has paid the policy premium in full, the insurance policy is not an executory contract for purposes of § 365 of the Bankruptcy Code . . . ."). As such, section 365 does not apply, and cannot be invoked to invalidate or modify provisions of the Insurance Policies.

## CONCLUSION

For the reasons stated, the Plaintiffs' motion for partial summary judgment is granted as to the Aetna Policy. Plaintiffs' motion and cross-motion are denied as to the St. Paul Policy and the National Union Policies. Travelers' and National Unions' cross-motions for summary judgment are granted. The parties are directed to contact chambers to arrange a conference to

discuss the possible mootness of the Limits Motions and the balance of the adversary

proceeding.

So ordered.

Dated:   New York, New York
June 7, 2016

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge