UNITED STATES BANKRUPTCY COURT                              -
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                              :
                                                    :    Chapter 11
          RAPID-AMERICAN CORPORATION,               :    Case No. 13-10687 (SMB)
                                                    :
                    Debtor.                         :
-------------------------------------------------------X
RAPID-AMERICAN CORPORATION, THE                     :
OFFICIAL COMMITTEE OF UNSECURED                     :
CREDITORS, AND LAWRENCE                             :
FITZPATRICK, THE FUTURE CLAIMANTS'                  :
REPRESENTATIVE,                                     :
                                                    :
                    Plaintiffs,                     :
                                                    :
              -against-                             :    Adv. Proc. No. 15-01095 (SMB)
                                                    :
TRAVELERS CASUALTY AND SURETY                       :
COMPANY, ST. PAUL FIRE AND MARINE                   :
INSURANCE COMPANY, AND NATIONAL                     :
UNION FIRE INSURANCE COMPANY OF                     :
PITTSBURGH, PA,                                     :
                                                    :
                    Defendants.                     :
-------------------------------------------------------X

## MEMORANDUM DECISION DENYING CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIMITS

**A P P E A R A N C E S :**

REED SMITH LLP
*Attorneys for the Debtor and Debtor-in-*
  *Possession*
599 Lexington Avenue, 22nd Floor
New York NY 10022

          Paul E. Breene, Esq.
          Paul M. Singer, Esq.
                Of Counsel

GILBERT LLP
*Attorneys for the Official Committee*
  *Of Unsecured Creditors and the Future*
  *Claimants' Representative*

1100 New York Avenue, NW Suite 700
Washington, DC 20005

>Kami E. Quinn, Esq.
>>Of Counsel

MENDES & MOUNT, LLP
*Attorneys for the Defendant National*
*  Union Fire Insurance Company of Pittsburgh, PA*
750 Seventh Avenue
New York, NY 10019

>Eileen T. McCabe, Esq.
>R. James Bradford, Esq.
>>Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union")

sold Rapid-American Corporation ("Rapid") a fourteen month excess insurance policy

with an "aggregate" limit of liability of $7 million.  Rapid, the Official Committee of

Unsecured Creditors, and the Future Claimants' Representative (collectively,

"Plaintiffs") commenced this adversary proceeding seeking, *inter alia*, a declaration that

the aggregate limit should be annualized such that the last two months of coverage

triggered an additional $7 million in coverage, or a total of $14 million in coverage.

Both sides have moved for partial summary judgment.[1]  For the reasons that follow, the

Court concludes that the National Union Policy is ambiguous, and summary judgment is

denied.

---

[1]    Defendant St. Paul Fire and Marine Insurance Company and Travelers Casualty and Surety
Company, f/k/a The Aetna Casualty and Surety Company ("Travelers") had sold a multi-year excess policy
with aggregate limits to Rapid that raised some of the same "limits" questions.  Travelers and the
Plaintiffs moved for partial summary judgment, and the Court denied both motions from the bench.
(*Order*, dated Mar. 2, 2017 (ECF Doc. # 139).)

## BACKGROUND

Rapid is the successor to the liabilities of The Philip Carey Manufacturing Company, a company that manufactured and distributed products containing asbestos. (*Second Amended Complaint*, dated July 24, 2015 ("*SAC*") at ¶ 1 (ECF Doc. # 26).) Starting in 1974, claimants began suing Rapid in asbestos-related personal injury actions. (*Id.* at ¶ 2.) While Rapid settled many claims, there were still approximately 275,000 outstanding asbestos-related personal injury claims against it when it commenced this chapter 11 case on March 8, 2013. (*Id.* at ¶ 4.)

National Union issued policy number 122-93-43, covering the fourteen month period from October 31, 1977 to January 1, 1979 (the "National Union Policy"). (*See Affirmation of R. James Bradford in Support of Defendant National Union's Cross-Motion for Partial Summary Judgment That National Union Policy No. 122-93-43 Has a Total Aggregate Limit of Liability of $7 Million,* dated Mar. 10, 2016 ("*Bradford Affirmation*"), Ex. 1 (ECF Doc. # 54-1).) It provided excess coverage in the amount of "$7,000,000 each occurrence and in the Aggregate part of $40,000,000 each occurrence" during the policy period. (*Id.*, Ex. 1 at 1.) The premium was "$7,000 - Policy Period." (*Id.*) The National Union Policy was part of a tower of $40 million in excess coverage that covered the same fourteen month period. (*See Affirmation of Paul M. Singer in Support of Plaintiffs' Motion for Partial Summary Judgment*, dated Jan. 22, 2016, Ex. B ("Rapid Coverage Chart") (ECF Doc. # 41-2); *SAC* at ¶ 24).)[2]

---

[2]     According to the Rapid Coverage Chart, several of Rapid's insurance policies terminated on October 31 while others terminated on January 1. It appears that the fourteen month period was designed to put all of the policies on a calendar year.

The National Union Policy consisted of a one page declaration and a one page endorsement, and did not contain an Insuring Agreement or any of the terms that usually govern the insurer-insured relationship.  Instead, it included a follow-the form provision[3] stating that it was "subject to all the terms and conditions set forth below [and] shall follow all the terms and conditions of Policy Number <u>to be Advised</u> issued by Northbrook Insurance Co. including any renewals or rewrites thereof."  It did not identify the Northbrook Insurance Company ("Northbrook") policy that it incorporated, and during the period of coverage, there were two.  The parties agree that the declaration incorporated Northbrook policy number 63-002-477 (the "Northbrook 1977 Policy"), which ran for one year from January 1, 1977 to January 1, 1978,[4] but they disagree as to whether it also incorporated Northbrook policy number 6-300-3826 (the "Northbrook 1978 Policy,"[5] and collectively with the Northbrook 1977 Policy, the "Northbrook Policies"), which covered the next calendar year.  The Northbrook 1977 and 1978 Policies provided, respectively, $15 million and $20 million in coverage per occurrence and "in the aggregate for each annual period where applicable."  (*Breene Affirmation*, Exs. B, at p. 2 of 21 & Ex. C, at p. 11 of 31.)[6]

---

[3]    A follow-the-form excess policy like the National Union Policy incorporates the terms and conditions of an underlying policy, but in the event of a conflict and unless the excess policy states otherwise, the terms of the excess policy control.  2 BARRY R. OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 13.01[a], at 1182-83 (18th ed. 2017).

[4]    A copy of the Northbrook 1977 Policy is annexed as Exhibit B to the *Affirmation of Paul E. Breene in Opposition to National Union's Cross-Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment on Limits*, dated Mar. 30, 2016 ("*Breene Affirmation*") (ECF Doc. # 72).)

[5]    A copy of the Northbrook 1978 Policy is annexed as Exhibit C to the *Breene Affirmation*.

[6]    Page references such as "p. 11 of 31" refer to the pagination imprinted at the top of each page on the Court's CM/ECF filing system.

4

The Northbrook 1977 Policy attached to the parties' pleadings consisted of a one page declaration and twenty pages of schedules and endorsements.  (*See id.*, Ex. B; *Affirmation of R. James Bradford in Support of National Union's Cross-Motion for Summary Judgment That the Coverage Obligations of National Union's Excess Policies Do Not Attach Until All Underlying Coverage Is Exhausted By Actual Payment of Claims or Losses*, dated Mar. 10, 2016, Ex. C (ECF Doc. # 60-3).)  The attachment did not include the Insuring Agreement or any of the terms or definitions relevant to the dispute, and was obviously incomplete.  At oral argument, counsel for the Plaintiffs supplied what he represented to be a complete copy of the Northbrook 1977 Policy, (Transcript of 2/16/17 Hearing, at 34:17-18 (ECF Doc. # 137)), but the Insuring Agreement was illegible.  (*Id.* at 41:4-6.)  Counsel implied that the Insuring Agreement was the same as the more legible Northbrook 1978 Policy discussed in the next paragraph, (*see id.* at 40:5-9), and National Union did not dispute this assertion.  Thus, it appears that the Northbrook Policies included the same Insuring Agreement with the same terms and definitions, and the dispute regarding the incorporation of the Northbrook 1978 Policy is immaterial to the current dispute.

The Northbrook 1978 Policy, in this regard, included language that supports the Plaintiffs.  It states that the "aggregate limit of liability applies separately to each consecutive annual period . . ., or if the last consecutive period is less than 12 months, to such period of less than 12 months."  (*Breene Affirmation*, Ex. C, at p. 3 of 31).  In addition, it defined "annual period" to mean "the twelve-month period following the policy effective date or following any anniversary date thereof falling within the policy period, or if the policy period between the policy effective date or any anniversary date

and the termination of this policy is less than twelve months, such lesser period." (*Id.*, Ex. C, at p. 6 of 31.)  Thus, under the Northbrook 1978 Policy, the aggregate limit applied separately to an additional consecutive period of less than one year.

As aptly stated by the Plaintiffs, '[t]he issue before this Court . . . is whether the fourteen month excess insurance policy sold to Rapid by National Union provides for two annual aggregate limits, or a single aggregate limit spread over the fourteen month policy period." (*Plaintiffs' Memorandum of Law in Opposition to National Union's Cross-Motion for Partial Summary Judgment and in Support of Their Cross-Motion for Partial Summary Judgment on Limits*, dated Mar. 30, 2016 ("*Plaintiffs' Memo*"), at 1 (ECF Doc. # 73).)  National Union argues that the National Union Policy unambiguously provided only $7 million in coverage for the fourteen months. (*Memorandum of Law in Support of National Union's Cross-Motion for Partial Summary Judgment that National Union Policy No. 122-93-43 Has a Total Aggregate Limit of Liability of $7 Million*, dated Mar. 10, 2016 ("*National Union Memo*"), at 3-6 (ECF Doc. # 56).)  Furthermore, any conflicts between the National Union Policy and the Northbrook Policies relating to the limit of liability must be resolved in favor of the National Union Policy.  (*Id.* at 7-9.)  In addition, the Plaintiffs represented that the National Union Policy was part of a $40 million tower, but their position would result in $47 million (or possibly $80 million) in excess coverage for the fourteen months.  (*Id.* at 9-10.)

The Plaintiffs counter that the National Union Policy follow-the-form language is "subject to" the underlying Northbrook Policies, including their language that annualizes the applicable aggregate limits.  (*Plaintiffs' Memo* at 5-6.)  The Plaintiffs also

argue that the term "subject to" means that the relevant documents (*i.e.* the National Union Policy and the Northbrook Policies) must be read together, rather than reading the National Union Policy's declaration as overriding the Northbrook Policies' language. (*Id.* at 6-7.) Additionally, the Plaintiffs argue that the Rapid Coverage Chart is a demonstrative aid that cannot be used to override the terms of the National Union Policy. (*Id.* at 13.)

## DISCUSSION

### A.    Standard Governing Summary Judgment

The parties' motion and cross-motion concern an insurance coverage dispute, and the insured bears the burden of proving coverage.[7] *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 947 N.E.2d 111, 115 (N.Y. 2011) ("*Union Carbide II*"); *see Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 690 (N.Y. 2002). As is usual in such disputes, the outcome depends on the terms of the insuring agreement, and in *Morgan Stanley Group, Inc. v. New England Ins. Co.*, 225 F.3d 270 (2d Cir. 2000), the Second Circuit outlined the rules that govern the interpretation of an insurance contract. "Under New York law, 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" *Id.* at 275 (quoting *Village of Sylvan Beach v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir. 1995). The threshold question of law is whether the terms of the insurance contract are ambiguous. *Id.* As with other contracts, an insurance contract is

---

[7]    Both sides rely on New York decisional law, and accordingly, New York law governs the interpretation of the National Union and Northbrook Policies. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[T]he parties' briefs assume that New York law controls this issue, and such 'implied consent . . . is sufficient to establish choice of law.'") (citing *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

ambiguous where its terms suggest "'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id. (quoting Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir. 1997). If the insurance contract is ambiguous, "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *Id.* at 275-76 (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir. 1998)). "'If the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'" *Id.* at 276 (quoting *McCostis v. Home Ins. Co.,* 31 F.3d 110, 113 (2d Cir. 1994)).

The rationale for construing an insurance contract against the insurer is that "[t]he terms of an insurance policy are usually what the insurance company chooses to make them." *Union Ins. Soc. Of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 951 (2d Cir. 1965). This does not mean that a court should invoke the doctrine in the first instance to resolve a motion for summary judgment dealing with an ambiguous insurance contract. *"[C]ontra proferentem* is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983); *accord William Gluckin*, 353 F.2d at 951; *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.

8

Supp. 1368, 1373 (E.D.N.Y. 1988) (Weinstein, J.) ("[T]he proper resolution under federal procedure and New York law is that summary judgment is proper on an ambiguous insurance policy when, after having allowed full discovery and found no valuable extrinsic evidence of the parties' intent, the court applies as a last resort the state law presumption construing the policy against the insurer."); *Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973) ("If there is ambiguity in the terminology used, however, and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury.").  If the insurance contract is ambiguous and the motion papers do not resolve the ambiguity, the Court should deny the motion for summary judgment even where it is unlikely that the parties will be able to adduce additional evidence of their intent. *William Gluckin*, 353 F.2d at 951-52.

## B.    The Policies

The National Union Policy plainly states that the policy period runs for fourteen months and $7 million is the aggregate limit of liability.  "Aggregate" is synonymous with "total" or "whole."  *See* BLACK'S LAW DICTIONARY 79 (10th ed. 2014) ("aggregate" means "[f]ormed by combining into a single whole or total"); MERRIAM-WEBSTER THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED, http://unabridged.merriam-webster.com/unabridged/aggregate (last visited May 11, 2017) ("aggregate" means "taking all units as a whole").  It seems a contradiction to interpret National Union's "aggregate" liability of $7 million to consist of two separate components of $7 million,

9

totaling $14 million.  Accordingly, National Union's interpretation of its policy is reasonable.

The next question is whether the Plaintiffs' interpretation is also reasonable.  The National Union Policy does not exclude annualization language, and as *Union Carbide II* shows, the aggregate limits in a multi-year excess policy may nonetheless be read as annual limits in light of annualization language in the incorporated, underlying policy.  In *Union Carbide*, Appalachian Insurance Company ("Appalachian"), the bottom layer insurer, issued a three year policy stating that the "aggregate" limit of liability was the "total limit . . . under this policy . . . during each consecutive twelve months of the policy period."  In other words, the aggregate limit was actually three separate annual limits.  Six other excess insurers, including Continental Casualty Company ("Continental") and Argonaut Insurance Company ("Argonaut"), issued three year "subscription form policies" that covered losses exceeding $70 million up to $100 million.  They explicitly followed form to the Appalachian policy "subject to the declarations" in the excess policies.  The declarations in those policies included the following: "LIMIT OF LIABILITY: $30,000,000, each occurrence and in the aggregate excess of $70,000,000.  Umbrella Liability."  The $30 million limit was to be divided equally—$5 million each— among the six insurers.  *Union Carbide II*, 947 N.E.2d at 112-13.

*Union Carbide* posed two questions relevant to the current dispute.  The first was whether the Continental and Argonaut limits of liability were aggregate or annual limits.  The insurers argued that the $30 million limit in the declaration trumped the follow-the-form clause and the annualized limits in the Appalachian policy because the follow-the-form clause was explicitly "subject to the declarations" in the excess policies which

spoke of aggregate, not annual limits.  In addition, Continental and Argonaut argued

that the limit of "$30,000,000 . . . in the aggregate" meant that the six insurers could

only be responsible, at most, for a collective $30 million during the three year policy

period, and each excess insurer could only be liable for $5 million.  *Id.* at 113.  Union

Carbide, like the Plaintiffs in this case, argued that the follow-the-form clause in the

excess policies imported the language that annualized the aggregate limit.  *Id.*  The New

York Supreme Court granted partial summary judgment to Union Carbide on the

aggregate limits issue, but the Appellate Division reversed in a split decision, the

majority concluding that the declarations prevailed over the terms of the underlying

policies.  *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 891 N.Y.S.2d 347, 349-50 (N.Y.

App. Div. 2009) ("*Union Carbide I*").

The Court of Appeals reversed the Appellate Division in *Union Carbide II*

primarily for two reasons.  First, the follow-the-form clause prevailed over the arguably

inconsistent declaration language because follow-the-form clauses are intended to

harmonize coverage and ensure that "large and complicated" insurance programs (such

as Union Carbide's) did not differ in how they spread out policy limits over time.  *Union

Carbide II*, 947 N.E.2d at 113.  The parties would not have intended that result.  Second,

it would be illogical to specify a limit of $30 million for "each occurrence" if the parties

intended a $30 million limit for the entire life of the policy; an "each occurrence" limit

would have been superfluous.  *Id.* at 113-14.

In reaching this conclusion, the Court declined to analyze extrinsic evidence

because the lower courts and the parties had endorsed or adopted that approach and the

meaning of the policies was clear.  *Id.* at 114.  It acknowledged that "there inevitably will

be cases in which the parties have not expressed themselves clearly in writing, and in which resort to extrinsic evidence will be necessary." *Id.* But even assuming that the Continental and Argonaut policies were ambiguous, all of the extrinsic evidence overwhelmingly supported Union Carbide's interpretation. *Id.* This included expert testimony that annualization was the universal custom of the industry, other evidence showing the existence of that custom, and evidence showing that some of the participants assumed that the limits would be annualized. *Id.*

The second relevant issue in *Union Carbide* concerned a two month extension of the three year excess policy issued by Continental. Continental argued that the one year limit of $5 million applied to the final fourteen months of the policy while Union Carbide contended that the two month extension (the "stub period") triggered a new annual limit so that it had $10 million of coverage for the final fourteen months. *Id.* The New York Supreme Court granted summary judgment to Union Carbide on the stub period issue, but the Appellate Division reversed concluding that the policy was ambiguous. *Union Carbide I*, 891 N.Y.S.2d at 350-51. On further appeal, the Court of Appeals described the question as "vexing" and neither result "wholly fair," *Union Carbide II*, 947 N.E.2d at 114, noted that a number of the courts that have considered the issue had "unsurprisingly" reached divergent results, *id.* at 114-15 (collecting cases), and affirmed the Appellate Decision's order speculating that extrinsic evidence might shed light on the facts and circumstances surrounding the parties' intentions and the negotiations leading to the extension. *Id.* at 115.

*Union Carbide II* illustrates that the "aggregate" limit of liability in an excess policy that follows-the-form does not automatically preclude the annualization of the

"aggregate" limit if the underlying policy annualizes aggregate limits. *Accord Travelers Cas. & Sur. Co. v. ACE Am. Reinsurance Co.*, 201 F. App'x 40, 41 (2d Cir. 2006) ("ACE contends that the plain meaning of 'aggregate' is a single aggregate limit. We disagree."). Moreover, many of the factors that *Union Carbide II* relied on to conclude that "aggregate" meant "annual" are present in this case. The National Union Policy was "subject to" the declarations in that policy but otherwise followed-the-form of the Northbrook 1977 Policy and possibly, the Northbrook 1978 Policy. In addition, Rapid had a large and complicated insurance program involving primary insurance and multiple levels of excess coverage that, in this case, did not match the periods of the underlying coverage. In addition, the Rapid Coverage Chart indicates that between January 1, 1975 and January 1, 1979, Rapid maintained $80 million in coverage during every calendar year. Thus, any interpretation that diluted the annual coverage by adding two more months to the limit seems contrary to the insurance program that Rapid put into place.[8] In addition, the National Union Policy had the same "per occurrence" and aggregate limits of liability. As *Union Carbide II* asked somewhat rhetorically, "[i]f $[7] million was the most that could be paid on the entire policy why . . . did the parties bother to specify a per occurrence limit in an equal amount?" *Union Carbide II*, 947 N.E.2d at 114.

---

[8]    For this reason, I question National Union's argument that the Plaintiffs' interpretation would grant it $47 million in tower coverage rather than $40 million in tower coverage. *Union Carbide II* illustrates that the extent of the tower coverage granted under the National Union Policy must be considered in light of Rapid's overall insurance program. If Rapid had exhausted the $7 million in coverage during the first twelve months, National Union's interpretation would compel the conclusion that during the last two months (October 31, 1978-January 1, 1979), Rapid had only $73 million in total coverage rather than the $80 million it may have thought it had.

While *Union Carbide II* supports the reasonableness of the Plaintiffs'
interpretation of "aggregate," it does not entitle them to partial summary judgment. The
Court of Appeals denied summary judgment on the "vexing" stub period issue, and here,
the annualization and stub period issues are intertwined; the stub period is the
additional annual period urged by the Plaintiffs. The terms of the Northbrook Policies
do support the Plaintiffs' interpretation, but the ambiguities noted nonetheless persist,
and the ultimate issue is the intent of the parties.[9] Accordingly, both interpretations are
reasonable, the National Union Policy is ambiguous and neither side has supplied
extrinsic evidence beyond the insurance policies themselves that might shed light on
their intent.

Finally, National Union's opposition to the reasonableness of the Plaintiffs'
interpretation is unpersuasive. It cites two unreported New York Supreme Court
decisions, *Central Park Studios, Inc. v. Slosberg,* Index No. 110490/08, 2014 N.Y. Misc.
Lexis 199 (N.Y. Sup. Ct. Jan. 13, 2014) and *200 Fifth Ave. Owner, LLC v. New
Hampshire Ins. Co.,* Index No. 104141/11, 2012 N.Y. Misc. Lexis 2731 (N.Y. Sup. Ct.
June 5, 2012), in support of its argument that the terms of the follow-the-form excess
policy control over inconsistent provisions in the underlying policy. (*National Union
Memo* at 7; *National Union's Reply Memorandum of Law in Further Support of
National Union's Cross-Motion for Partial Summary Judgment that National Union
Policy No. 122-93-43 Has a Total Aggregate Limit of Liability of $7 Million and in*

---

[9]    The Plaintiffs attempt to distinguish *Union Carbide II* noting that it involved an extension of
coverage while the National Union Policy was always a fourteen month policy. (*Plaintiffs' Memo* at 10.)
This is certainly true but does not change the inquiry into the parties' intent. It merely refocuses the
inquiry from the intent at the time the extension was granted in *Union Carbide* to the time the parties
entered into the National Union Policy.

*Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment on Limits*, dated Apr. 13, 2016 ("*National Union Reply Memo*"), at 3-4 (ECF Doc. # 85).)  These cases are distinguishable.  Both concluded, *inter alia*, that a follow-the-form provision in an excess policy could not convert an excess policy into a primary policy or affect the relative priorities between insurers.  *See Central Park Studios,* 2014 N.Y. Misc. Lexis 199, at *12 ("The follow-form provision in the second Delos policy does not convert that excess policy into a primary policy [and] only applies where there is no inconsistency between the two policies, and there is clearly an inconsistency as to their priority, as one is a primary policy and the other is excess."); *200 Fifth Ave. Owner, LLC v. New Hampshire Ins. Co.,* 2012 N.Y. Misc. Lexis 2731, at *15-16 ("[D]efendant's follow form provision [does not] state that it will become a primary insurer or that its coverage comes into play prior to AIG's.  As stated above, the terms of the insurance policy that has a follow form provision prevails over the terms of the policy whose form it follows.")

The National Union and Northbrook policies concern aggregate limits, not priorities.  And notwithstanding identical "subject to" language, *Union Carbide II* concluded that the aggregate limits in multi-year excess policies had to be interpreted in harmony with the follow-the-form provision and the annualization language in the primary policy.  Thus, the two New York cases cited by National Union are distinguishable, but to the extent National Union insists they are not, their reasoning does not survive *Union Carbide II.*

Finally, National Union places substantial reliance on *Maryland Cas. Co. v. W.R. Grace & Co.*, No. 88 CIV. 2613 (JSM), 1996 WL 169326 (S.D.N.Y. Apr. 11, 1996). (*National Union Memo* at 7-9; *National Union Reply Memo* at 6, 8.)  In *Maryland*

*Casualty*, Fireman's Fund Insurance Company ("Fireman's") had issued a multi-year excess policy (the 1966 policy) with a limit of liability of $5 million per occurrence and $5 million "aggregate." *Maryland Casualty*, 1996 WL 169326, at *3. The Fireman's policy included a follow-the-form provision incorporating the terms of the underlying policy "except for limits of liability." (*Id.*) The insured (Grace) asserted that the aggregate limit should be read as an annual limit. It noted that the underlying policy annualized the aggregate limits, Grace had paid the same premium for the Fireman's policy and the underlying policy which also provided $5 million in coverage annually, and the excess policies above the Fireman's policy specifically referred to the underlying policies as containing aggregate annual limits. *Id.* at *5.

The *Maryland Casualty* Court rejected Grace's position, and concluded that the 1966 policy contained an aggregate limit of $5 million. Finding the language of the 1966 policy plain and clear, it declined to consider extrinsic evidence to contradict it. Moreover, Grace had purchased other insurance policies that contained the word "annual," and was clearly able to negotiate such a term in the 1966 policy had the parties agreed to it. *Id.* The Appellate Division in *Union Carbide I* relied on *Maryland Casualty* in rejecting Union Carbide's contention that the aggregate limits of the multi-year excess policies should be interpreted as annual limits. *Union Carbide I*, 891 N.Y.S.2d at 349 ("We agree with Judge Martin's analysis in [*Maryland Casualty*], as the relevant terms of the multi-year excess policies are indistinguishable from those in *W.R. Grace.*")

But the Court of Appeals in *Union Carbide II* reversed the Appellate Division. It cited *Maryland Casualty* as an example of a decision that construed similar language

16

and rejected annualization, *Union Carbide II*, 947 N.E.2d at 113, but concluded that Union Carbide "has the better argument." *Id.* Moreover, the excess policy in *Maryland Casualty* expressly excluded the limits of liability in the underlying policy, a distinction emphasized by Justice Tom in his dissent in *Union Carbide I. See Union Carbide I*, 891 N.Y.S.2d at 352 (Tom, J, dissenting).[10] The National Union Policy does not contain a similar, express exclusion.

Returning to the Plaintiffs' formulization of the issue, the Court cannot determine as a matter of law "whether the fourteen month excess insurance policy sold to Rapid by National Union provides for two annual aggregate limits, or a single aggregate limit spread over the fourteen month policy period." The National Union Policy is ambiguous, additional extrinsic evidence may shed light on what the parties intended, and as far as I can tell, they have not engaged in discovery on this issue. The motions for partial summary judgment are therefore denied. The Court has considered the parties' remaining arguments, and concludes that they lack merit.

---

[10]    National Union also quoted from *Uniroyal, Inc. v. Am. Re-Insurance Co.,* Dkt. No. A-6718-02T1, 2005 WL 4934215, at *16 (N.J. App. Div. Sept. 13, 2005) which stated that courts applying New York law have "held that generalized 'follow form' language is incapable of increasing an insurer's unambiguous, bargained-for limits of liability respecting annualized limits." (*National Union Memo* at 8.) That conclusion is questionable after *Union Carbide II*. In addition, *Uniroyal* concluded after trial that a thirty day extension of one of the policies involved in that case did not create a new annual period. *Id.* at *19-21. *Union Carbide II* cited *Uniroyal* as an example of a decision that held that the stub period did not create a new annual period, but concluded that it was not bound by *Uniroyal* or the other decisions cited by the parties, and ultimately decided that the question could not be resolved on a motion for summary judgment. *Union Carbide II*, 947 N.E.2d at 114-15.

The parties are directed to contact chambers to schedule a conference for the purpose of discussing the trial or other disposition of the adversary proceeding.  Settle order on notice.

Dated: New York, New York
        May 15, 2017


/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge