**Plaintiffs' Reply Deadline: April 19, 2019**
**Hearing Date: To Be Determined**

Eileen T. McCabe, Esq.
R. James Bradford, Esq.
Jaimie H. Ginzberg, Esq.
Glenn Greenberg, Esq.
MENDES & MOUNT, LLP
750 Seventh Avenue
New York, NY  10019
Telephone: (212) 261-8000
Facsimile: (212) 261-8750
eileen.mccabe@mendes.com
james.bradford@mendes.com
jaimie.ginzberg@mendes.com
glenn.greenberg@mendes.com
*Attorneys for the Defendant National Union Fire Insurance Company*
*of Pittsburgh, PA*

David Christian, Esq. *(pro hac vice)*
DAVID CHRISTIAN ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602
312-273-1807
dchristian@dca.law

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11<br>Case No. 13-10687-smb |
| RAPID-AMERICAN CORPORATION, | |
| Debtor. | |
| RAPID-AMERICAN CORPORATION,<br>THE OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS, and LAWRENCE FITZPATRICK,<br>THE FUTURE CLAIMANTS' REPRESENTATIVE,<br>Plaintiffs, | |
| v. | Adversary Proceeding No.<br>15-01095 |
| TRAVELERS CASUALTY AND SURETY<br>COMPANY, ST. PAUL FIRE AND MARINE<br>INSURANCE COMPANY, AND NATIONAL<br>UNION FIRE INSURANCE COMPANY OF<br>PITTSBURGH, PA, | |
| Defendants. | |

## NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE RIGHT TO ALLOCATE INSURANCE COVERAGE SETTLEMENT FUNDS

## TABLE OF CONTENTS

                                                                                        **Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND .................................................................................................3

I.      The National Union Policies...................................................................................3

II.     The Settlement Agreements.....................................................................................4

III.    Discovery Remains Outstanding and is Ongoing in this Matter. .........................6

ARGUMENT ...........................................................................................................................7

I.      Plaintiffs Seek An Improper Advisory Opinion. ...................................................7

II.     Local Rule 7056 -1 Prohibits any Partial Summary Judgment in Plaintiffs' Favor. ..........9

III.    Rapid Does Not, and Never Did, Have the Right to Use the Settlement Funds
        Freely. .......................................................................................................................11

        A.      The Settlement Agreements Expressly Limited Rapid's Use of the
                Settlement Funds and Required That Such Funds Be Placed in Escrow................12

        B.      The Escrow Account Was Approved As A Qualified Settlement Fund
                Under 26 U.S.C. § 468B. ............................................................................15

        C.      Through Security Agreements, Rapid Assigned All Rights to the
                Settlement Funds to the Benefit of Underlying Claimants. ................................16

IV.     There is No Basis in Law or Fact to Reallocate Settlement Funds Paid By One
        Insurer to Establish Exhaustion of Another Insurer's Policies. .........................19

V.      Section III of Plaintiffs' Brief Need Not Be Addressed By The Court As it Does
        Not Seek Any Summary Judgment Relief. ............................................................22

CONCLUSION.......................................................................................................................23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ayotte v. Gervasio*,
    619 N.E.2d 400  (N.Y. 1993).................................................................7

*Carrier Corp. & Elliott Co. v. Allstate Ins. Co.*,
    No. 2005-EF-7032, 2018 WL 7137965 (N.Y. Nov. 21, 2018)..........................21

*J.P. Morgan Chase & Co. v. Indian Harbor Ins. Co.*,
    98 A.D.3d 18, 22–23 ( N.Y. App. Div. 2012) ....................................23

*Maryland Casualty Co. v. W.R. Grace & Co.*,
    No. 88 Civ. 2613 (JSM), 1996 WL 109068, *12 (S.D.N.Y. Mar. 12, 1996) ...................20

*Olin Corp. v. Lamorak Ins. Co.*,
    No. 84-cv-1968 (JSR), 2018 WL 1901634 (S.D.N.Y Apr. 17, 2018)........................21, 22

*Pac. Emp'rs Ins. Co. v. Troy Belting & Supply Co.*,
    No. 1:11-CV-912, 2014 WL 2805312 (N.D.N.Y. June 20, 2014) ......................................8

*Sood v. Rampersaud*,
    No 12-CV-5486(VB), 2013 WL 1681261 (S.D.N.Y. April 17, 2013)................................8

*Zuckerman v. New York City Transit Auth.*,
    404 N.E.2d 718, 720 (N.Y. 1980)...................................................................7

**Statutes**

26 U.S.C. § 468B .................................................................................2, 5, 15, 16

**Rules**

Fed. R. Civ. P. 30(b)(1) .................................................................................11

Local Rule 7056.................................................................................2, 9, 10

Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") respectfully submits this Memorandum of Law in Opposition to the "Motion for Partial Summary Judgment on the Right to Allocate Insurance Coverage Settlement Funds" filed by Plaintiffs Rapid American Corporation ("Rapid"), the Official Committee of Unsecured Creditors (the "Committee"), and Lawrence Fitzpatrick, the Future Claimants' Representative (the "FCR"), collectively referred to herein as "Plaintiffs."

## PRELIMINARY STATEMENT

Plaintiffs' motion[1] asks this Court for a declaration that "in allocating claims to exhaust the coverage underlying the policies issued by [National Union] and to exhaust the National Union policies themselves on an all-sums basis, Rapid can use any funds, regardless of their source, to meet its obligation to show 'actual payment' of liability." Pls.' Mem. in Supp. of its Mot. for Partial Summ. J. on the Right to Allocate Ins. Coverage Settlement Funds ("Pls.' Mem.") 4, ECF No. 198-1.[2] This request is for a prohibited advisory opinion under the guise of a motion for partial summary judgment fails for numerous reasons.

First, as the relief sought by this motion is expressly dependent upon a prior finding that either of the National Union policies is subject to an "all sums" allocation, it should be denied as moot for the reasons set forth in National Union's Opposition to Plaintiffs' Motion for Partial Summary Judgment on Allocation.

---

[1] National Union refers to the instant motion as Plaintiffs' Motion for Partial Summary Judgment despite what appears to a typographical error in Plaintiffs' papers designating the motion as one for summary judgment. Given the nature of the relief requested, even if Plaintiffs were successful (which they should not be), this motion is not case dispositive.

[2] All citations herein are to the Document page numbers electronically notated by the Court upon electronic filing.

1

Second, the present motion fails even if the Court were to address its merits. The motion depends on the false premise that the settlement funds paid by Rapid's other insurers to resolve their respective disputes over insurance coverage for asbestos bodily injury claims are Rapid's assets over which it has "unfettered use." *See, e.g.* Pls.' Mem. 6. Regardless of the theoretical scenarios set forth in Plaintiffs' brief, the facts developed to date in this case indicate that those settlement funds in fact are not (and never were) Rapid's property to freely use. To the contrary, action to ensure against Rapid's "unfettered use" of settlement funds was taken by the settling insurers, who required, for example, an escrow agreement that required settlement funds to be deposited in an escrow account that was ultimately approved as a Qualified Settlement Fund under 26 U.S.C. § 468B, thus restricting the use of the funds. *See infra* at Argument Sections III.A and III.B. For example, the escrow agreement expressly sets forth the "permitted uses" of the settlement funds and, pursuant to the Internal Revenue Code, the Qualified Settlement Fund is the owner of the property in the fund —not Rapid. *Id.* Fettering of Rapid's use of funds was also undertaken as to the underlying claimants, on behalf of whom at least 160 agreements were entered whereby a "first protected security interest in" the insurance proceeds was assigned to a collateral agent for the claimants' benefit). *See infra* at Argument Section III.C. Yet, none of these facts are addressed by Plaintiffs. Instead, Plaintiffs' Motion is replete with hypothetical, conclusory statements and factual allegations regarding the settlement funds that are false, entirely unsupported by any citation to evidence (let alone admissible evidence) as required by Local Bankruptcy Rule 7056 -1, and are nonetheless disputed with evidence as set forth below.

At the end of the day, Plaintiffs ask this Court to enter a "judgment" declaring how the settlement funds Rapid obtained from settling insurers could theoretically be used, while simultaneously entirely failing to address constraints on the use of the funds and how the funds

were actually used, all in order to obtain a purported right to a blank check over use of National Union policy proceeds that Rapid cannot access anyway. The instant motion is doubly improper because it is an attempt to circumvent this Court's 2016 ruling that the limits of the policies underlying the National Union policies must be exhausted by actual payment. *See* Mem. Decision and Order Granting in Part and Denying in Part Pls.' Mots. for Partial Summ. J. and Granting Defs.' Cross-Mots. For Summ. J. dated Jun. 7, 2016 ("June 2016 Mem. Decision and Order"), ECF No. 94 at p. 3. Moreover, each of the following aspects of Plaintiffs' motion presents genuine disputes of material fact that are for the finder of fact to decide later (and at this stage remain subject to outstanding discovery): the ownership of the settlement funds, what claims those settlement funds could be used for or actually were used for, whether Plaintiffs can ultimately establish that the insurance policies underlying the National Union insurance policies have been fully and properly exhausted by actual payment as this Court required, and the amount of recovery under the National Union policies themselves (if any). There is no basis under any prior ruling from this Court, the evidence, the policies or any source of law to grant Plaintiffs the relief they seek in the present motion. National Union respectfully requests that the motion be denied in its entirety.

## FACTUAL BACKGROUND

### I.    The National Union Policies

There are two high-level excess National Union policies at issue in this case: National Union Policy No. 122-93-43, in effect from October 31, 1977 to January 1, 1979 and National Union Policy No. 9608477, in effect from January 1, 1984 to January 1, 1985. *See* Affirmation of R. James Bradford in Supp. of National Union's Opp'n to Pls.' Motion for Partial Summ. J. on the Right to Allocate Ins. Coverage Settlement Funds ("Bradford Aff.") Ex. A; *see also* Bradford

3

Aff. Ex. B.

In a Memorandum Decision and Order dated June 7, 2016, this Court held that the National Union policies require actual payment of the underlying limits before the National Union Policies can even potentially be reached. *See* June 2016 Mem. Decision and Order, ECF No. 94 at p.3. Subsequently, Plaintiffs filed a Rule 60(b) motion to vacate, in part, the June 7, 2016 ruling to the extent this Court had also found that Plaintiffs could not meet their burden to establish exhaustion of the underlying limits by actual payment. In doing so, Plaintiffs successfully argued that issues pertaining to actual payment were subject to discovery and asserted that this Court previously acknowledged that "[w]e don't know if they've really hit the policy limits, They may not have, they may have. . . ." *See* Adversary Proceeding Pls.' Mem. of Law in Supp. of their Rule 60(b) Mot. to Vacate, in Part, the June 2016 Mem. Decision and Order, ECF No. 113 at p. 13. Plaintiffs' success on the Motion to Vacate based on the representations they made therein is the only reason this case is still pending before this Court. Discovery done to date since then, some of which is discussed herein, supports National Union's position that Plaintiffs will not be able to establish the settlement funds were Rapid's to use freely and that they will be unable to prove actual exhaustion.

## II.    The Settlement Agreements

After a prolonged dispute over coverage for Rapid's asbestos bodily injury claims, and as a compromise to resolve pending litigation regarding the coverage dispute, in 1998 and 1999 Rapid entered into settlement agreements (referred to collectively herein as the "Settlement Agreements") with the following insurers: New England Reinsurance Corporation, Royal Indemnity Company, and Hartford Accident and Indemnity Company; Northbrook Excess and Surplus Insurance Company; Continental Casualty Company;  Atlanta International Insurance

Company; Fireman's Fund Insurance Company; Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies. *See* Affirmation of Michael B. Rush in Supp. of Pls.' Mot. for Summ. J. on the Right to Allocate Ins. Coverage Settlement Funds ("Rush Aff.") Exs. 1, 2, 3, 4, 5 & 6, ECF Nos. 198-3–198-9. A settlement was later reached with Lumbermens Mutual Casualty Company in 2006. *See* Rush Aff. Ex. 7, ECF No. 198-10  The foregoing insurers are referred to collectively herein as the "Settling Insurers."[3]

Each of the Settlement Agreements contains express provisions that require the respective settlement payments be made directly into an escrow account (referred to herein as the "Escrow Account"). *See* Rush Aff. Ex. 1, at 8; Ex. 2, at 7–8; Ex. 3, at 4–5; Ex. 4, at 8–9; Ex. 5, at 6–7; Ex. 6, at 4; Ex. 7, at 3. The Settlement Agreements further provide (with some variation in precise wording) that settlement amounts paid into the Escrow Account "shall only be expended for the indemnity…or the defense of asbestos-related claims." *See* Rush Aff. Ex. 1, at 9; Ex. 2, at 7; Ex. 4, at 11; Ex. 5, at 8; Ex. 6, at 4; Ex. 7, at 4.  In fact, to ensure that the funds were being appropriately managed and utilized in line with the Settlement Agreements and the Escrow Agreement, the insurers' insisted that an independent third party (Crawford & Company) be retained to oversee the claims handling process. *See* Bradford Aff. Ex. C, at 86:16–87:2. Furthermore, the Escrow Account was approved as a designated fund, referred to as a "Qualified Settlement Fund" ("QSF") by Rapid, pursuant to 26 U.S.C. § 468B.  The QSF asked for and

---

[3] In footnote 2 of their brief, Plaintiffs state that "Rapid did enter into certain other settlements, but they are not relevant to this motion." Plaintiffs do not explain what they are referencing, or offer any explanation as to their unilateral conclusion that "they are not relevant to this motion." This is yet another indication of the factual disputes surrounding this issue and the outstanding discovery to which National Union is entitled.

received from the Internal Revenue Service its own Employer Identification Number and filed its own tax returns. *See* Bradford Aff. Ex. D.

Additionally, Rapid entered into settlement agreements and related security agreements with more than 160 plaintiff law firms. *See* Bradford Aff. Ex. E, at RAC00501859-50. Reports provided by Rapid to National Union included schedules identifying the asbestos bodily injury claims that had been paid using proceeds from the Settlement Agreements and specifically indicated that all of the claims on the schedule "were approved for payment by either Allstate or Crawford & Company." *Id.* at RAC00501859-50–51. Specifically, Rapid expressly reported that payments settling the scheduled claims were paid out of the Escrow Account "into which the securitized funds were deposited." *Id.* at 51. In summarizing the funds received from the settling insurers via the Settlement Agreements, Rapid itself stated as of May 2006 that "more than $207,908,000 of securitized insurance proceeds have been deposited in that escrow account and payments have been made from that account in settlement of deferred claims." *Id.* The referenced security agreements themselves explicitly state that a collateral agent was assigned a "first protected security interest in" the insurance proceeds for the benefit of the underlying claimants. *See e.g.* Bradford Aff. Ex. F, at RAC001104-3; Ex. G, at RAC00096454-3; Ex. H, at RAC00112563-3; Ex. I, at RAC00111179-3; & Ex. J, at RAC00110603-3.

### III.    Discovery Remains Outstanding and is Ongoing in this Matter.

As a general matter, the fact discovery cut-off is currently August 16, 2019 and expert discovery is to be completed by November 18, 2019. While the discovery conducted to date clearly establishes that there are material facts as to which there are genuine issues to be tried (*see infra* Argument Section), there is outstanding discovery to be conducted in this case that bears on the issues presented by this motion and which could add to the plethora of facts as to

which there is a genuine dispute. This includes further pending discovery related to information concerning all settlements with other insurers, as well as full details as to what Rapid did with the money it received from these insurers, where it deposited the money, who was in control of the money, who disbursed the money, when and how. *See, e.g.,* Bradford Aff. at Ex. R and Ex. S. Despite the fact that more than enough facts have already been developed to defeat the partial summary judgment sought by Plaintiffs here, National Union is entitled to complete both fact and expert discovery as necessary.

## **ARGUMENT**

Summary judgment is appropriate when "[t]he cause of action or defense [has been] established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party." N.Y. C.P.L.R. 3212(b). To prevail, "the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact." *Ayotte v. Gervasio*, 619 N.E.2d 400, 401 (N.Y. 1993) (internal quotations and citation omitted). "The failure to make such prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers." *Id.* (internal quotations and citation omitted). An opposing party can defeat a motion for summary judgment by "produc[ing] evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim" or "demonstrat[ing] acceptable excuse for his failure to meet the requirement of tender in admissible form." *Zuckerman v. New York City Transit Auth.*, 404 N.E.2d 718, 720 (N.Y. 1980).

**I.      Plaintiffs Seek An Improper Advisory Opinion.**

The legal determination relevant to the issue of underlying exhaustion has already been made by this Court when it ruled that the National Union Policies require actual payment of the

underlying limits. *See* June 2016 Mem. Decision and Order, ECF No. 94 at 3.    Plaintiffs'

numerous yet unexplained conclusions that a denial of the instant motion would result in a

"rewriting of the policies" is a red herring. In reality, the relief sought would be an improper

advisory opinion that directs how Plaintiffs can show that the limits underlying the National

Union Policies have been exhausted by actual payment. The advisory nature of the relief sought

by the instant motion is exemplified by Plaintiffs' own brief, which states as follows:

> At trial, Rapid will put forth evidence that it has paid amounts sufficient to
> exhaust all of those policies, as well as the National Union Policies
> themselves. Whether Rapid has done so is a 'factual issue' not ripe for
> summary judgment, and Rapid is not seeking a ruling on this issue today."
> Pls.' Mem. 13 n. 10, ECF No. 198-1.[4]

In addition to being nearly incomprehensible and confusing, by Plaintiffs' own admission

they are improperly asking for a ruling in this case about what they could do, as opposed to a

ruling based on the actual facts about what they did do. *See Pac. Emp'rs Ins. Co. v. Troy Belting

& Supply Co.*, No. 1:11-CV-912, 2014 WL 2805312, at *7 (N.D.N.Y. June 20, 2014) ("[T]he

motion is 'partial' because Hartford admits that the facts necessary to determine how to apply the

legal standards applicable to this case have not yet been collected. Hartford therefore seeks an

advisory opinion from the Court that the Court is not permitted to provide."); *see also Sood v.

Rampersaud*, No 12-CV-5486(VB), 2013 WL 1681261, at *3 (S.D.N.Y. April 17, 2013)

("Accordingly, the Court is left with the prospect of issuing of what amounts to an advisory

opinion on the question of how many SCA violations have occurred, without knowing the yet-to-

---

[4] All citations herein are to the Document page numbers electronically notated by the Court upon
electronic filing.

8

be discovered facts of the case. Instead of rendering such an opinion, the Court denies defendant's motion for summary judgment.").

There are no legal issues presented and the instant motion seeks no determination that is ripe for a summary judgment as a matter of law. Plaintiffs acknowledged as much in their hotly disputed motion to vacate the Court's prior partial summary judgment on actual payment, wherein Plaintiffs expressly argued that how and what it can allocate to show actual payment is an issue of fact. Pls.' Mem. of Law in Supp. of their Rule 60(b) Mot. to Vacate 18–22, ECF No. 113. Discovery is ongoing now, as it was then, and at best there are material facts as to which there are genuine issues to be tried that wholly bar summary judgment in Plaintiffs' favor.

For these reasons and those set forth in detail below, National Union respectfully submits that Plaintiffs' motion must be denied.

## II.    Local Rule 7056 -1 Prohibits any Partial Summary Judgment in Plaintiffs' Favor.

Local Rule 7056-1 requires that a motion for summary judgment must be supported by a separate statement of "the material facts as to which the moving party contends there is no genuine issue to be tried." LBR 7056-1 (b).

The purported Statement of Undisputed Facts submitted by Plaintiffs in support of the instant motion, however, does not contain many of the "facts" actually set forth in Plaintiffs' brief and upon which their arguments rely.[5] For example, the following "facts" set forth in the "Statement of Facts" section of Plaintiffs' brief are not alleged in their Statement of Undisputed Facts:

---

[5] National Union's complete objections to the Statement of Undisputed Facts that Plaintiff did provide are set forth fully in its Response to Plaintiffs' Statement of Undisputed Facts, which has been filed separately pursuant to Local Rule 7056.

- "In [the Settlement Agreements], the settling insurers did not pay or purport to pay for any specific Underlying Claims, and the agreements permitted Rapid to use the settlement proceeds to pay any claims it wished." Pls.' Mem. 8–9.

- "Once those funds were received, they generally went into an escrow account held on behalf of Rapid where they were mixed with other funds such that it was impossible to tell the source for payment of any particular Underlying Claim." Pls.' Mem. 9.

- "Rapid then used **its** funds to pay Underlying Claims as necessary." Pls.' Mem. 9. (emphasis added).

Plaintiffs' failure to allege that the foregoing are material facts as to which they contend there is no genuine issue to be tried in and of itself renders such facts in dispute. Even if Plaintiffs did contend that there is no genuine dispute as to these facts, National Union fervently contests same for all of the reasons set forth in detail below. Moreover, Plaintiffs have cited absolutely no evidence in support of any of the foregoing "facts," let alone admissible evidence as required. LBR 7056 -1(e). It follows that Plaintiffs' motion fails on its face.

Moreover, Plaintiffs' Statement of Undisputed Facts cites almost exclusively to the Rush Aff., Esq., an attorney with Gilbert LLP who serves as "Insurance Counsel to the Official Committee of Unsecured Creditors ("Committee") and Lawrence Fitzpatrick, the Representative of Future Claimants ("FCR") in this action." *See* Rush Aff. 2, ECF No. 198-3. While Mr. Rush's Affirmation states that he is "fully familiar with the facts and circumstances stated herein based on personal knowledge and the attached documents," it must be noted that Mr. Rush has taken the position on behalf of his clients that "all of the relevant facts in this case pre-date the legal creation of both the Committee and the FCR" and that neither the Committee nor the FCR have independent knowledge of this matter, and have alleged their own, independent claims, against National Union." *See* Bradford Aff. Ex. K. Mr. Rush has previously also stated that the individuals that make up the Committee have "absolutely no knowledge regarding the facts,

issues, or claims involved in this insurance adversary proceeding." *See* Bradford Aff. Ex. L. In turn, both the Committee and the FCR have objected to Fed. R. Civ. P. 30(b)(1) notices that National Union served over a year ago, and have refused to produce any witnesses to date.

For Mr. Rush, as attorney for the Committee and the FCR, to now assert that he has personal knowledge of the policies and Settlement Agreements is entirely improper. Despite the discovery position that Mr. Rush has articulated on behalf of his clients and the refusal to allow National Union to depose his clients, Plaintiffs offer the Rush Affirmation in support of the instant motion—which is entirely based on disputed facts pertaining to the alleged use of settlement funds that pre-date both the Committee and the FCR's existence. Based on the position taken by the Committee and the FCR to date, the Rush Affirmation is insurmountably deficient. Therefore, the Rush Affirmation and the exhibits thereto should be disregarded in their entirety and Plaintiffs' motion should be denied on this basis alone.

**III.    Rapid Does Not, and Never Did, Have the Right to Use the Settlement Funds Freely.**

Notwithstanding the procedural and evidentiary defects of the instant motion, Plaintiffs' principal argument is also based entirely on the false notion that the settlement funds are Rapid's assets, which are fungible and can be used at Rapid's discretion. *See, e.g.,* Pls.' Mem. 15–17. As described in detail above, Plaintiffs' only purported support for such an argument is reliance on argumentative and unsupported conclusory statements that are not based on any actual facts currently in the record. To the contrary, discovery conducted to date has revealed that the settlement funds are not—and never were—Rapid's assets. Based on this alone, Plaintiffs' Motion must be denied.

A.    **The Settlement Agreements Expressly Limited Rapid's Use of the Settlement Funds and Required That Such Funds Be Placed in Escrow.**

While Plaintiffs rely heavily on the Settlement Agreements and Rapid's purported ownership of its "insurance proceeds," Plaintiffs entirely ignore the actual terms and requirements set forth in the Settlement Agreements. As an initial matter, each of the Settlement Agreements contains express provisions that require settlement payments to be made directly into an Escrow Account. *See* Rush Aff. Ex. 1, at 8; Ex. 2, at 7–8; Ex. 3, at 4–5; Ex. 4, at 8–9; Ex. 5, at 6–7; Ex. 6, at 4; Ex. 7, at 3. The Settlement Agreements further provide (with some variation in precise wording) that settlement amounts paid into the Escrow Account "shall only be expended for the indemnity…or the defense of asbestos-related claims." *See* Rush Aff. Ex. 1, at 9; Ex. 2, at 7; Ex. 4, at 11; Ex. 5, at 8; Ex. 6, at 4; Ex. 7, at 4.

Indeed, the Escrow Agreement itself further contradicts Plaintiffs' assertion that "[o]nce [the settlement funds] were received, they generally went into an escrow account held on behalf of Rapid where they were mixed with other funds such that it was impossible to tell the source for payment of any particular Underlying Claim" and that the Underlying Claims were "paid with Rapid's money." Instead, the Escrow Agreement expressly provided that the "[E]scrow Agent has agreed to accept, hold and disburse the Settlement Payments deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement." *See* Bradford Aff. Ex. M, at RAC00387816-2. ¶ 7. Moreover, the Escrow Agreement defines "Permitted Uses" of the settlement funds deposited in the escrow account to include "payment or reimbursement of indemnity" and "defense costs in respect of Asbestos Actions." The entire purpose of Escrow Agreement itself is to "effect the provisions of the Settlement Agreements" *id.* at ¶ 8 and the Settlement Agreements each contain provisions defining indemnity payments (and defense costs

12

where applicable) as payments made for asbestos bodily injury claims. *See* Rush Aff. Ex. 1, at 9; Ex. 2, at 8; Ex. 3, at 4–5; Ex. 4, at  5; Ex. 5, at 8; Ex. 6, at 4; Ex. 7, at 4.

Certain of the Settlement Agreements even refer to the Escrow Account as "Rapid-American Corporation **Asbestos** Escrow Account." See e.g. Rush Aff. Ex. 7, at 3. In fact, Mr. Paul Weiner, a Director, Vice President, Secretary and Treasurer of Rapid, submitted a declaration to this Court in the context of the Bankruptcy action (referred to herein as the "Weiner Declaration") wherein he expressly distinguished between Rapid's "General Bank Account" and the Escrow Account. Decl. of Paul Weiner Pursuant to R. 1007-2 of the Local Rules for the S.D.N.Y. in Supp. of Chapter 11 Pet. and First Day Pleadings at ¶¶ 25–27, *In re Rapid-American Corp.*, No. 13-10687-smb (Bankr. S.D.N.Y. March 8, 2013); *see infra* Argument Section III.B.

It is clear that the Settlement Agreements themselves contained restrictions that prevented Rapid from encountering a situation where "it was impossible to tell the source for payment for any particular Underlying Claim." This is only further evidenced by the fact that at least one of the agreements required receipt of monthly statements that included, *inter alia*, the "identity of each of the claimants to whom payments are made **using proceeds of [the settling insurer's] Excess Policies.**" *See* Rush Aff. Ex. 4, at 7, ¶ 2(f). (emphasis added). Among other things, the outstanding discovery National Union is entitled to conduct in this case includes discovery regarding any such monthly statements.

Additionally, to ensure that the funds were being appropriately managed and utilized in line with the Settlement Agreements and the Escrow Agreement, the Settling Insurers insisted that a third party be retained to oversee the claims handling process. *See* Bradford Aff. Ex. C, at 86:16–87:2. Crawford & Company was retained and was required to approve claims and send

13

requests to the escrow agent, the Bank of New York, prior to any disbursement of the settlement funds. *See* Bradford Aff. Ex. C, at 86:16–87:2 & 118:11–119:11; Ex. M, RAC00387816-3 & RAC00387816-5.    The Bank of New York would then send the money to Crawford & Company's account (not to Rapid's account). *See* Bradford Aff. Ex. C, at 118:11–119:11 & 120:15–121:17.    Only then would Crawford & Company—not Rapid—disburse the funds to a given claimant's counsel to be paid to that claimant. *See id.* At no point in this process (which was explicitly contracted for between Rapid and the Settling Insurers) did Rapid have any control over any of the Settling Insurers' funds. In fact, the Escrow Agreement expressly provides that the "Escrow Account shall at all times remain within the exclusive jurisdiction of the Coverage Action Court. The Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by the Coverage Action Court with respect to the Escrow Funds." Bradford Aff. Ex. M, at RAC00387816-9, ¶ 9(b). For Plaintiffs to now contend that the settlement funds were Rapid's assets over which it had "unfettered use" is simply contrary to reality (and a plain misrepresentation of the facts).

Ultimately, Plaintiffs entirely ignore that the settling insurers directed where their funds be deposited and how they be used. Contrary to the entire premise of Plaintiffs' brief, meticulous steps were clearly taken and contracted for by the settling insurers to ensure that the settlement funds were not treated as "Rapid's money." To the extent Rapid relies on any provision in any of the Settlement Agreements to argue that "Rapid is permitted 'in its sole discretion to reallocate or substitute other indemnity and/or defense payments for those indemnity and/or defense payments which have been paid from the Settlement Amount," such reliance is misplaced and at best unsupported by anything other than speculation at this stage. Plaintiffs conveniently fail to address that the Settlement Agreements containing such language likewise expressly tie the

14

"Settlement Amount" to the payment of claims under the specific policies that are the subject of the respective agreements. It follows that, at best, any "reallocation" must refer to reallocation amongst the policies that are subject to the release in each of the Settlement Agreements. Tellingly, the very settlement that Plaintiffs cite as an example to support its reliance on this "sole discretion to reallocate" language in fact explicitly requires that "any such reallocation or substitution must be reported in a timely fashion by Rapid to Fireman's Fund." See Rush Aff. Ex. 2 at 7, ¶ 3.8.

National Union is entitled to conduct full discovery regarding the allocation of settlement funds and payment of underlying claims, including into communications Rapid has had with any settling insurers regarding any purported "reallocation." Such discovery remains ongoing and Plaintiffs should not be permitted to curtail National Union's right to same.

**B.     The Escrow Account Was Approved As A Qualified Settlement Fund Under 26 U.S.C. § 468B.**

Furthering the restrictions placed on the use of the Settlement Funds and solidifying that such funds were not (and are not) "Rapid's money," the additional step of requiring that the Escrow Account comply with the provisions of 26 U.S.C. § 468B ("§ 468B") was taken. See Bradford Aff. Ex. M., at RAC00387816-6, ¶ 5(c). Plaintiffs' deceptively fail to even mention that the Escrow Account was approved as a "Qualified Settlement Fund under § 468B of the Internal Revenue Code." Decl. of Paul Weiner at ¶ 26, *In re Rapid-American Corp.,* No. 13-10687-smb. Section 468B sets forth "Special Rules for **Designated** Funds" and explicitly provides that "the fund shall be treated as the owner of the property in the fund (and any earnings thereon)." *See* § 468B(3)(c) (emphasis added). By the very nature of the title of the statute itself, § 468B only applies to designated, specific funds—not any funds that an entity may use at their discretion as Plaintiffs would lead this Court to accept.

15

In reality, the Escrow Agreement provided that the Settling Insurers would make their agreed payments "to an escrow account to be established by Rapid." By Rapid's own admission, this escrow account was then qualified as a Qualified Settlement Fund ("QSF"). The designated funds—the settlement funds—were in turn placed into the QSF. In addition to all of the requirements of the Settlement Agreements and Escrow Agreement described above, this only bolsters that the funds were not the property of Rapid, but the property of the fund as a matter of law. *See* § 468B (3)(c).

In fact, the QSF asked for and received from the Internal Revenue Service its own Employer Identification Number and filed its own tax returns. *See* Bradford Aff. Exs. D, N, & O. By virtue of having the Escrow Account approved as a QSF, Rapid held the designated funds (the settlement funds) out as property of the fund, as opposed to property of Rapid, and the funds were treated accordingly for purposes of the QSF's taxes. Nonetheless, Plaintiffs now brazenly assert that the settlement funds deposited in the QSF were "Rapid's money" over which it had complete discretion and that the funds "went into an escrow account held on behalf of Rapid." Pls.' Mem. 9. This is patently false and contradicts the entire purpose of the QSF. There is absolutely no basis for Plaintiffs to argue otherwise.

### C.     Through Security Agreements, Rapid Assigned All Rights to the Settlement Funds to the Benefit of Underlying Claimants.

Even if the Settlement Funds— which were deposited in an Escrow Account that was then approved as a QSF under § 468B—were Rapid's (which they were not), Rapid's own settlement agreements with representatives of the underlying claimants eviscerate any argument that the settlement funds are "Rapid's money."

Since at least 2006, Rapid has reported to National Union that it "has entered into Settlement Agreements and related Security Agreements with more than 160 plaintiff law

16

firms… ." Bradford Aff. Ex. E, at RAC00501859-50. Correspondence from Rapid to National

Union purporting to provide an update expressly included, for instance, a schedule identifying

the asbestos bodily injury claims that had been paid using proceeds from the Settlement

Agreements and specifically indicates that all of the claims on the schedule "were approved for

payment by either Allstate or Crawford & Company."[6] *Id.* Specifically, Rapid expressly reported

that payments settling the scheduled claims were paid out of the Escrow Account "into which the

securitized funds were deposited." *Id.* at RAC00501859-51. In summarizing the funds received

from the settling insurers via the Settlement Agreements, Rapid itself stated as of May 2006 that

"more than $207,908,000 of **securitized insurance proceeds** have been deposited in that escrow

account and payments have been made from that account in settlement of deferred claims." *Id.*;

*see also* Bradford Aff. Ex. P, at RAC00501859-101. These representations were reiterated and

expanded upon in other correspondence from Rapid to National Union. *See* Bradford Aff. Ex. Q.

The referenced security agreements expressly provide that the collateral agent[7] was assigned, for

the benefit of the underlying claimants, a "first protected security interest in" the insurance

proceeds. *See e.g*, Bradford Aff. Ex. F, at RAC00110411-2–3. Specifically, the security

agreements state that Rapid

> hereby assigns by way of security and grants to the Agent for the benefit of
> the [Settling Plaintiffs and the Agent] a continuing first perfected security

---

[6] Notably, Rapid also expressly stated that it had been "advised by the Collateral Agent who
oversees the escrow account that to date he has disbursed therefrom $174,380,242 in settlement
of claims, and anticipates making further disbursements in the future." Bradford Aff. Ex. E, at
RAC00501859-51. That Rapid had no independent knowledge of the disbursements from the
Escrow Account only further illustrates that Rapid had no control over the settlement funds and
was clearly not entitled to use those funds at its discretion.

[7] The "collateral agent" is designated in the Security Agreements as Michael Rozen, who served
as mediator.

interest in and to all **right, title and interest of Rapid in, to and under the following property** (collectively, the 'Collateral'):

(a) (i) **all rights of [Rapid] under the Insurance Company Settlement Contracts** to receive the Insurance Company Installment Payments set forth on Schedule 1 hereto **and the right to the Proceeds of the Insurance Company Installment Payments**. . .

*Id.* In fact, various of Rapid's settlement and corresponding agreements with representatives of the underlying claimants expressly identified each of the settling insurers and scheduled the precise funds being paid by those insurers for which the underlying claimants would hold the securitized interest. *See* Bradford Aff. Ex. F, at DENTONS_USB_00002976-9 & RAC00110411-9; Ex. G, at DENTONS_USB_00002981-9–21 & RAC00096454-9; Ex. H, at DENTONS_USB_00003014-9–11 & RAC00112563-9; Ex. I, at DENTONS_USB_00002999-8–9 & RAC00111179-9; Ex. J, at DENTONS_USB_00002973-9–11 & RAC0011603-11. In some instances, Rapid's settlement agreements with representatives of the underlying claimants also included listings of the specific claimants who would be entitled to the specific insurance proceeds subject to the terms of the settlement agreements and security agreements. *See id.* Plaintiffs' brief is devoid of any reference to the settlements and security agreements that Rapid entered with respect to the underlying claimants. At the same time, Plaintiffs have represented to this Court—without any citation to any admissible evidence in the record—that "Rapid was free to use the Insurance Coverage Settlement proceeds just as it would be permitted to use the funds from the sale of any other asset."[8] Pls.' Mem 16. The fallacy of Plaintiffs' argument is illustrated

---

[8] Inasmuch as Plaintiffs argue in a footnote that National Union does not have standing to enforce the Settlement Agreements, any such argument is yet another red herring. National Union is not trying to enforce any provision of the Settlement Agreements. National Union is

by their own analogy whereby they argue that "the proceeds Rapid received from selling policies back to the settling insurers for full policy releases are no different than proceeds Rapid would receive from the sale of a factory or any other asset that it owned." *Id.* While that theoretically could be the case, the actual facts and circumstances of this case are directly to the contrary. Such an analogy implies that Rapid could also buy a factory with the Settlement Funds, as if such funds were like any money it would receive from a sale of other "assets." This is demonstrably false.

It is actually beyond dispute that the settlement funds are not, and never were, assets owned by Rapid and that they did not have free reign over the money. The Escrow Agreement, the QSF, and the security agreements described in detail above each dictate that the settling insurers' funds were used to pay specific asbestos claims and that the funds were not within Rapid's control or Rapid's property. Plaintiffs have offered no evidence to the contrary and their motion must be denied.

## IV.    There is No Basis in Law or Fact to Reallocate Settlement Funds Paid By One Insurer to Establish Exhaustion of Another Insurer's Policies.

Plaintiffs ask this Court to permit it to take claims that were paid with insurance recoveries from other insurers and allocate those same (already paid) claims to the policies that underlie the National Union Policies. There is no basis in law or fact to allow Rapid to

relying on the facts developed in this case and the terms and conditions of the National Union Policies. Plaintiffs are arguing that they can fulfill their burden to establish exhaustion of the underlying policies through actual payment—a condition precedent to coverage under the National Union policies—by reallocating claims already paid with funds obtained from other insurers. That is the only alleged factual basis for their ability to establish actual payment and National Union is permitted to dispute such allegations. Plaintiffs cannot use the Settlement Agreements as a shield and a sword.

manipulate claims already paid with other insurers' funds to prove exhaustion of another insurer's policies.  As discussed above, Rapid itself reported to AIG that well over $200 million in payments of the underlying claims were made using the securitized insurance proceeds – and the security agreements in conjunction with the settlement agreements expressly attributed which of the Settling Insurers' funds the settling claimants would be entitled to. *See* Bradford Aff. Ex. E, at RAC00501859-5; Ex. F, at DENTONS_USB_00002976-9 & RAC00110411-9; Ex. G, at DENTONS_USB_00002981-9–21 & RAC00096454-9; Ex. H, at DENTONS_USB_00003014-9–11 & RAC00112563-9; Ex. I, at DENTONS_USB_00002999-8–9 & RAC00111179-9; Ex. J, at DENTONS_USB_00002973-9–11 & RAC0011603-11. National Union is not aware of any case law in the context of "all sums" allocation or otherwise that allows for the allocation of claims paid by another insurer to exhaust a separate insurer's policies. To the contrary, case law provides that coverage determinations made subsequent to settlements reached with certain insurers has no bearing on the allocation of claims under such settlements. *See Maryland Casualty Co. v. W.R. Grace & Co.*, No. 88 Civ. 2613 (JSM), 1996 WL 109068, *12 (S.D.N.Y. Mar. 12, 1996) (holding that "Insurers contract to cover a particular period. If they settle before a final determination as to whether or not the injury actually or reasonably occurred within that period and it is later shown that the injury in fact occurred outside of the policy period, **the settlement amount is still allocated to the period that the settling insurer contracted to cover.**") (emphasis added).

The unsupportable nature of Plaintiffs' argument is further demonstrated by their untenable position that they can go as far as to use claims paid by other insurers to establish that the limits of the National Union Policies have been exhausted. This argument defies logic. First, National Union has no obligation under any law or policy term to reimburse Rapid for claims

20

already paid by other insurers. Any such request for reimbursement would clearly amount to impermissible double recovery and this argument fails on its face. Even assuming Rapid could allocate the settlement funds as it chooses, whether previously paid claims are covered under the National Union policies is disputed and certainly not the subject of the instant motion. National Union respectfully submits that the Court must dismiss any argument that pertains to any purported exhaustion of the limits of the National Union Policies.

Nor is Plaintiffs' position supported by any case law. The main case cited by Plaintiffs, *Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-1968 (JSR), 2018 WL 1901634 (S.D.N.Y Apr. 17, 2018) ("*Olin*"), does not support an argument that Plaintiffs may reallocate claims paid by settling insurers to establish exhaustion of another insurer's policies. The court's conclusion in *Olin* that it was the insurer's "burden to prove how much the settled insurers actually paid to resolve Olin's claims" was decided in the context of the court's assessment of a non-settling insurer's right to set off or a reduction of limits from carriers who had issued policies in other years; that is entirely unrelated to Plaintiffs' burden here to establish underlying exhaustion.[9] Most significantly, as Plaintiffs note, in *Olin* "'witnesses stated that settlement payments [received from policy buy-backs] went into Olin's general corporate account, rather than site-specific accounts' and that the 'settlement funds were used to fund Olin's 'primary operations, whether it is debt payments, capital expenditure or other short-term cash needs.'" Pls.' Mem. 14 (citing *Olin*, 2018 WL 1901634, at *6).

---

[9] The *Carrier Corp. & Elliott Co. v. Allstate Ins. Co.*, No. 2005-EF-7032, 2018 WL 7137965 (N.Y. Nov. 21, 2018) case cited by Plaintiffs is also inapposite. There, after what appears to be full fact and expert discovery, the court adopted the *Olin* court's decision on burden in the context of the application of settlement credits and did not address any argument akin to Plaintiffs' argument in this case.

Leaving aside the complex procedural history and limited scope of the ruling in the *Olin* decision Plaintiffs cite, the instant facts are wholly distinguishable. Unlike in *Olin*, the settlement funds at issue here were placed into an Escrow Account that was approved as a QSF over which Rapid had no control and from which only asbestos-related claims could be paid. The underlying claimants were further assigned a securitized interest in the settlement funds. *See supra* Sections C.2, C.3.  Moreover, the *Olin* court's reliance on testimony and other discovery that the parties conducted itself speaks to the insufficiency of Plaintiffs' Motion; it is indisputable that discovery is ongoing in this case.

Whether Plaintiffs can meet their burden to prove underlying exhaustion through the requisite actual payment of the underlying limits is an issue of fact for the finder of fact to decide. This includes issues pertaining to the settlement funds and Rapid's alleged use and treatment thereof.   Discovery on many issues, including this precise issue, is underway and remains ongoing.  Plaintiffs cannot usurp National Union's right to complete same by asking for this advisory ruling at this stage. Plaintiffs' Motion should be denied.

**V.      Section III of Plaintiffs' Brief Need Not Be Addressed By The Court As it Does Not Seek Any Summary Judgment Relief.**

In Argument Section III of their brief, Plaintiffs assert that "even if Rapid must use settlement proceeds from insurers within the National Union tower, it will prove at trial that the obligations of the National Union policies are triggered." Plaintiffs admit that whether it can prove that "it has applied sufficient funds to reach the National Union policies" is a triable issue of fact. Moreover, footnote 1 of Plaintiffs' brief appears to address the same issue and specifically states "that issue is not before the Court on this present Motion." Pls.' Mem. 6, n. 1 ("If necessary, at trial, Rapid will prove that it received sufficient funds from carriers underlying the National Union Policies and made 'actual payment' of the claims allocated to those policies.

But, that issue is not before the Court on this present Motion."). The argument set forth in Section III of Plaintiffs' brief is nothing more than a placeholder riddled with disputed facts that need not be addressed by the Court.

Having said that, it is National Union's position that Plaintiffs' alternative argument likewise fails. Plaintiffs themselves have repeatedly argued that that the Settlement Agreements do not contain any allocation to any specific policies issued by the settling insurer. Yet, for this line of argument, Plaintiffs argue that they can allocate all of the funds received from a settling insurer to exhaust specific policies issued by that settling insurer—despite the fact that no such specification was made in the agreement itself. Plaintiffs cannot have it both ways and are barred from doing so. *See J.P. Morgan Chase & Co. v. Indian Harbor Ins. Co.*, 98 A.D.3d 18, 22–23 ( N.Y. App. Div. 2012) (holding that where a settlement agreement did not allocate between the subject policies, a finding of exhaustion of one policy's limits by actual payment was precluded as it was impossible to determine from the settlement agreement how much of the settlement was actually attributable to that policy).

<u>**CONCLUSION**</u>

For all the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment on the Right to Allocate Insurance Coverage Settlement Funds should be denied in its entirety.

Dated: New York, New York
      March 29, 2019

Respectfully submitted,

/s/ Eileen T. McCabe
Eileen T. McCabe, Esq.
R. James Bradford, Esq.
Jaimie H. Ginzberg, Esq.
Glenn Greenberg, Esq.
MENDES & MOUNT, LLP
750 Seventh Avenue
New York NY 10019
Telephone: (212) 261-8000

23

Facsimile: (212) 261-8750
eileen.mccabe@mendes.com
james.bradford@mendes.com
jaimie.ginzberg@mendes.com
glenn.greenberg@mendes.com

- And -

David Christian, Esq. *(pro hac vice)*
DAVID CHRISTIAN ATTORNEYS LLC
3515 W. 75th Street, Suite 208
Prairie Village, KS 66208
Telephone: (913)-674-8215
dchristian@dca.law
dvanthournout@dca.law

*Attorneys for the Defendant National Union
Fire Insurance Company of Pittsburgh, PA*